**Susan Camille LEE, Individually, and as Trustee of the Article V Trust for the Benefit of Susan C. Gibson, and Derivatively on Behalf of the Article IV Trust and the Estate of Katherine Pillot Lee Barnhart, and Susan C. Gibson, Individually, and Derivatively on Behalf of the Article IV Trust and the Estate of Katherine Pillot Lee Barnhart, Appellants,**

v.

**Ronald E. LEE, Jr., Individually, as Trustee of the Article IV Trust, and the Article V Trust for the Benefit of Katherine Lee, and as Executor of the Estate of Katherine Pillot Lee Barnhart, Appellee.**

No. 14–97–00162–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 17, 2001.

Rehearing Overruled May 17, 2001.

Thomas A. Zabel, Houston, Daniel J. Sheehan, Marc S. Culp, Dallas, for appellants.

Adam P.Schiffer, Thomas B. Greene, D. Gibson Walton, Marie R. Yates, R. Glen Rigby, Houston, for appellants.

Panel consists of Justices ANDERSON, HUDSON, and Senior Chief Justice MURPHY.*

* Senior Chief Justice Paul C. Murphy sitting by assignment.

## CORRECTED OPINION

HUDSON, Justice.

This is an appeal from a judgment in a probate case in which appellants sought removal of the executor/trustee and sought damages for breaches of fiduciary duty and for excessive executor fees. After granting appellee's motion for judgment notwithstanding the verdict and disregarding several jury findings, the trial court rendered judgment: (1) refusing to remove appellee as executor and trustee, and (2) awarding $2.8 million in damages and prejudgment interest to the Article IV trust. Appellants raise eight issues and appellee brings three cross-points. In our corrected opinion of February 8, 2001, this court affirmed in part and reversed and rendered in part.

Appellants have filed a third motion for rehearing. We now withdraw our corrected opinion of February 8, 2001, and issue this corrected opinion, affirming in part and reversing and rendering in part.

### Background

When Katherine Barnhart died in 1975, her will provided that the bulk of her estate was to pass to a trust (the "Article IV Trust"). Barnhart's two children, appellant Susan Lee, and her brother, appellee Ronald Lee, were each entitled to one-sixth of the income from the Article IV Trust, and so much of the remaining two-thirds as necessary for their health, support and maintenance, considering the "availability of funds from other sources." The remaining income was to go into separate trusts for each of the grandchildren (the "Article V Trusts"). The Article V Trusts were to distribute income to the grandchildren to the extent necessary to provide for their health, support and maintenance, also considering the "availability of funds from other sources."

As provided in the will, appellee was appointed executor of the will (and trustee of the trusts) and began administration in 1976. Appellee filed the estate's inventory reflecting a date of death value of $12.8 million. After negotiations that continued until 1992, appellee and the IRS agreed upon a taxable value of the estate assets of $12 million. By this time, federal and state inheritance taxes totaled approximately $7 million. Because the majority of the estate's assets were raw land, the estate was unable to pay the taxes it owed and the trusts could not be funded.

In February 1980, appellee reached an agreement with the IRS regarding the estate taxes due. The total amount due was $2.8 million, and the interest on that amount as of February 1980 was approximately $475,000 (for a total debt to the IRS of approximately $3.5 million). The estate also owed the State of Texas approximately $800,000 in inheritance taxes. Because the estate had little available cash, appellee continued to request extensions on these debts. Other debts continued to amass, including ad valorem taxes on the various parcels of real estate.

In December 1980, appellee accepted an unsolicited offer to purchase 61 acres of a large tract on Westheimer Road for $19.5 million. The contract provided for payment in four annual installments. Appellee funded the Article IV Trust in 1982 with a deposit of $4 million. Appellant, Susan Lee, received her first distribution from the Article IV Trust in January 1983 in the amount of $15,784.

Appellee testified that, by the time he funded the Article IV Trust, he had taken more than $1 million in executor fees. By December of 1983, appellee had taken a total of $2,836,000 in fees. Although the IRS initially disputed the amount of this fee, they ultimately allowed the deduction of $1.5 million of appellee's fee.

In December 1985, appellee received a letter from Susan Lee's attorney stating that she had never received an accounting and demanding one at the earliest possible date. This letter also asked about appellee's plans and expected distributions. Appellee did not produce an accounting in response to this request. In 1988, Susan Lee's attorney sent appellee a certified letter requesting an accounting from November 1975 to the present under section 149A of the Probate Code. This letter demanded receipt of the accounting by December 17, 1988, and requested copies of all income tax returns filed for the estate and any trusts. Appellee did not produce the accounting on the deadline and appellants filed suit several days later.

Appellee did not list the remaining Westheimer property or the Pasadena property for sale. Although he received an unsolicited offer to sell the remaining Westheimer tract, appellee did not respond to this offer because he found it to be a bad proposal in that the offeror required high-density sewer capacity and would not pay for the portion of the property within the flood plain. In 1984, appellee had received another unsolicited offer to buy the Pasadena property for $2.3 million, which he did not accept because it was not a cash deal. Appellee did not make counteroffers to either of these offerors. In 1984, appellee had also received a contract offering $12,500 per acre for the Pasadena property. This was not a cash offer and appellee did not make a counteroffer.

Two family ranches were also in the estate: Cap Rock Ranch and River Bend Ranch. These ranches increased the estate's debts because they incurred taxes and were unprofitable. In 1990, River Bend Farm was leased for $20,000 per year. Appellee did not believe he could sell the family ranch because he and Susan Lee owned it jointly. Appellee discussed the possibility of partitioning with Susan Lee's attorney, but this never occurred.

During 1990–91, appellee considered developing the remaining Westheimer property into a residential subdivision to be called "Knollwood Trails." The development never received a loan and was ultimately abandoned. By 1991, appellee had spent more than $700,000 on Knollwood.

In April 1994, K–Mart bought a 21 acre parcel of the Westheimer tract for $8 million. The trial court ordered that these sale proceeds along with other estate assets be transferred to the Article IV trust. A year later, appellee funded the Article V trust.

Susan Lee brought suit individually and as trustee of the Article V Trust for the benefit of her daughter, Susan Gibson, and derivatively on behalf of the Article IV Trust and the Estate. Her daughter, Susan Gibson, was also a named plaintiff. Although the original suit was for an accounting and for removal of appellee as executor and trustee, additional claims included breaches of fiduciary duty, conversion, fraudulent concealment, constructive fraud and/or fraud, negligence, and gross negligence.

The case was tried to a jury and the jury found that appellee had breached fiduciary duties, that he charged unreasonable fees and expenses to the estate, that his fees and expenses were unreasonable by approximately $2.2 million, that the breaches of fiduciary duty resulted in damages, and that appellee defended against removal in bad faith. The jury also found that the breaches of fiduciary duty were not committed with gross negligence. Appellee filed a motion for judgment notwithstanding the verdict and to disregard jury findings. The trial court granted this motion in part, disregarding the jury's findings of breach of duty and damages for the

failure to sell the Westheimer and Pasadena property, the bad faith defense finding, and found the following:

(1) the Article IV trust was entitled to judgment against appellee in the amount of $840,000 (amount found by jury) for breach of fiduciary duty relating to the Knollwood development;

(2) the Article IV Trust was entitled to judgment against appellee in the amount of $1.00 (amount found by jury) for the breach of fiduciary duty relating to River Bend Farm;

(3) the Article IV Trust was entitled to judgment against appellee in the amount of $1.00 (amount found by jury) for the breach of fiduciary duty relating to Cap Rock Ranch;

(4) the Article IV trust was entitled to judgment against appellee in the amount of $659,506.50 (consisting of the $2.2 million of unreasonable executor fees less the tax savings realized by the Estate from the deduction of such fees on the Estate's estate tax return) plus prejudgment interest of 10% per annum, computed as simple interest; and

(5) the Article IV trust was entitled to judgment against appellee in the amount of $163,550 for unreasonable office expenses.

The judge also awarded appellants' attorneys reasonable and necessary attorney's fees of $1.5 million and awarded appellee's attorneys fees of $1.5 million, all reimbursable from the Estate (plus additional amounts for appeal).

### Excessive Executor Fee

■ Appellants first challenge the trial court's reduction of the excessive executor fee finding. The jury found that the $2.8 million executor fee taken by appellee was unreasonable and excessive by approximately $2.2 million. The trial court reduced the jury's finding by $1.5 million, stating in the judgment that he was awarding appellee $659,506.50, which represented the jury finding of $2.2 million "less the tax savings realized by the Estate from the deduction of such fees on the Estate's estate tax return. . . ."

Appellants contend the impact of the court's deduction is to allow appellee to reap $1.5 million for his wrongful conduct as long as the fee results in a tax deduction. Citing *Anderson v. Armstrong*, 132 Tex. 122, 120 S.W.2d 444 (1938), appellants contend the remedy for excessive fees is return of the entire amount with interest at the highest legal amount.

Appellee responds with three arguments: (1) the Probate Code supports the trial court's exercise of discretion to determine the amount of the fee; (2) *Burrow v. Arce*, 997 S.W.2d 229 (Tex.1999)[1] supports a trial court determination of fee forfeiture; and (3) the "tax benefits rule" authorizes the trial court to deduct the amount of tax savings realized.

■ We turn first to appellee's claim that section 241 of the Probate Code supports the trial court's decision to reduce the jury's award. Section 241 concerns compensation for personal representatives. This section provides that executors and other representatives are entitled to receive a commission of five percent of the gross fair market value of the estate. *See* TEX. PROB.CODE ANN. § 241 (Vernon Supp. 2000). This statutory amount has been held to represent a fair and reasonable compensation. *See In re Roots' Estate*,

---

1. In his brief, appellee cited to *Arce v. Burrow*, 958 S.W.2d 239 (Tex.App.—Houston [14th Dist.] 1997, writ granted). Since submission of this case, the Texas Supreme Court has issued its opinion affirming in part, and reversing and remanding in part. *See Burrow v. Arce*, 997 S.W.2d 229 (Tex.1999).

596 S.W.2d 240, 243 (Tex.App.—Amarillo 1980, no writ). The last sentence of section 241 provides that the "court may, on application of an interested person or on its own motion, deny a commission allowed by this subsection in whole or in part if: (1) the court finds that the executor or administrator has not taken care of and managed estate property prudently. . . ." *Id.* at § 241(a)(1).

Because the will provides for a reasonable fee for the executor, both parties agree that section 241 is inapplicable as it concerns the amount of compensation appellee may be paid for his role as executor. This interpretation is supported by case law. *See, e.g., Stanley v. Henderson,* 139 Tex. 160, 162 S.W.2d 95 (1942). Despite the inapplicability of the subsection setting executor compensation, appellee argues another subsection of this same statute applies, and gives the trial court discretion, to reduce an executor's fee where there is a finding of imprudent management. Appellants, on the other hand, claim that where, as here, the will sets compensation, no part of the statute applies. In support of this argument, appellants cite *Stanley.*

We do not find *Stanley* dispositive on the question whether the last sentence of section 241(a) applies to this issue. First, when the *Stanley* opinion issued, the last sentence of the present version of section 241(a) was not yet part of the statute. Second, *Stanley* does not address the issue presented here, whether the last sentence of section 241(a) applies on appeal to support a trial judge's decision to reduce a jury finding of damages for charging an excessive fee.

Because it provides for a standard fee, section 241 applies in situations where the will does not set compensation, and the executor seeks compensation in the statutory amount or for a greater amount. *See, e.g., Weatherly v. Martin,* 754 S.W.2d 790, 793–94 (Tex.App.—Amarillo 1988, writ denied). Therefore, this section is available for an executor to seek the statutory five percent or may be used by an opponent, or the trial court on its own motion, to deny the executor a fee, in whole or in part. These applications of the statute, however, are not relevant to this case because the will set compensation.

First, appellee did not raise a section 241 objection to the fee questions on the ground that the questions were within the trial court's discretion. Appellee also did not base his objection to the jury's finding on section 241. Instead, appellee argued in his motion for judgment notwithstanding the verdict that there was no evidence to support the jury's finding. Appellee cited to the testimony of his expert accountant, Greg Bardnell, who testified that, when tax benefits and interest savings to the estate are considered, the $2.8 million in fees actually cost the estate only $850,000. Citing *In re Garvin's Will,* 256 N.Y. 518, 177 N.E. 24 (1931), appellee claimed the amount of tax savings must be considered. Appellee further argued that, even if legally sufficient evidence supported the jury's finding of unreasonableness, appellants could only recover the actual cost to the estate of the excessive fees.[2]

In addition to the absence of an objection under section 241, the trial court did not, on its own motion, apply section 241 to deny all or part of appellee's fee. Instead, the issue of unreasonableness of the fee was submitted to the jury. Furthermore, the trial court did not apply section 241 in granting the motion for judgment notwithstanding the verdict. In its final judg-

---

**2.** This amount represents the estate tax cost of $660,000, less $144,087 the estate would have owed in interest if appellee had not paid himself $2.2 million of the total fee.

ment, the court specifically found that "the Article IV Trust is entitled to judgment against Ronald E. Lee, Jr. in the total amount of $659,506.50 (which consists of the $2,198,355 of unreasonable executor fees found by the jury less the tax savings realized by the Estate from the deduction of such fees on the Estate's estate tax returns) . . . ." Because section 241 was not raised as a ground for appellee's motion for judgment notwithstanding the verdict, we may not consider it on appeal.

■ The trial court also did not reduce the jury's finding because there was no evidence supporting it. Instead, the trial court specifically stated he was reducing the fees by deducting the amount of tax savings realized by the estate. Therefore, we must determine whether the trial court properly applied the "benefits rule" to reduce the jury's finding. Appellee claims the trial court properly applied the "benefits rule" under *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984).[3]

*Nelson* addressed the question whether Texas should recognize a cause of action for wrongful life. 678 S.W.2d at 924. In reaching their decision to follow the majority of courts refusing to adopt such a cause of action, the Texas Supreme Court observed that one rationale for not allowing a cause of action for wrongful life is that, in awarding damages, the court must offset any special benefits to the plaintiff resulting from the negligence. *See id.* (with citation to RESTATEMENT (SECOND) OF TORTS § 920 (1979)). Section 920 of the Restatement of Torts allows consideration of the value of benefits to the interest of the plaintiff that was harmed, to the extent

this is equitable. *See* RESTATEMENT (SECOND) OF TORTS § 920 (1979).

Section 920A, however, augments section 920, providing that "[p]ayments made to or benefits conferred on the injured party from *other sources* are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." *Id.* at 920A (emphasis added). This section of the Restatement is the basis for the long-recognized "collateral source rule," which precludes a tortfeasor from obtaining the benefit of payment conferred upon the injured party from sources other than the tortfeasor. *See Castillo v. American Garment Finishers Corp.,* 965 S.W.2d 646, 650 n. 2 (Tex.App.—El Paso 1998, no writ). In Texas, the collateral source rule has been held to apply in cases where the injured party received insurance benefits, *see Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 934 (Tex.1980), general fringe benefits, *see McLemore v. Broussard,* 670 S.W.2d 301, 303 (Tex. App.—Houston [1st Dist.] 1983, no writ), gratuitous services, *see Oil Country Haulers, Inc. v. Griffin,* 668 S.W.2d 903, 904 (Tex.App.—Houston [14th Dist.] 1984, no writ), and worker's compensation benefits. *See Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 582 (Tex.App.—Houston [1st Dist.] 1992, no writ).

Because the estate received a tax deduction from the IRS, a source other than the tortfeasor in this case, it would initially appear that the collateral source rule should prevent appellee from obtaining the benefit of this deduction. More on point, however, are the cases regarding tax bene-

---

**3.** Appellee also cites *Deloitte & Touche v. Weller,* 1997 WL 572530 (Tex.App.—Amarillo 1997), *opinion withdrawn and superseded on rehearing,* 976 S.W.2d 212 (Tex.App.—Amarillo 1998, writ denied) The *Weller* opinion to which appellee cites was withdrawn on re-

hearing and the substitute opinion does not address the "benefits rule." *See Deloitte & Touche v. Weller,* 976 S.W.2d 212 (Tex.App.—Amarillo 1998, writ denied). Accordingly, we do not discuss this case.

fits. Appellants cite *LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 697 (Tex.App.—Dallas 1992, writ denied), in which the court, in dicta, notes its agreement with a Supreme Court case, *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). In *Randall*, the Court held that tax benefits may not offset a party's recovery. Appellee attempts to distinguish *Randall* on the grounds that it "(1) dealt with income (not estate) taxes; (2) turned on construction of securities fraud statutes; and (3) disallowed consideration of income tax benefits because of the statutory intent to punish and deter and because the tax benefit was speculative." Appellee claims the jury in this case found no culpable mental state calling for punishment or deterrence, the savings by the estate tax deduction is not speculative, and the IRS can no longer assess additional estate taxes or disallow the deduction because the time for doing so has passed.

*Randall* involved allegations of securities fraud. *See* 478 U.S. at 650, 106 S.Ct. 3143. Petitioners asserted claims under § 10(b) of the Securities Exchange Act of 1934 and § 12(2) of the Securities Act of 1933. *See* 478 U.S. at 651, 106 S.Ct. 3143. Respondents argued petitioners' damages should be reduced by the amount of tax benefits received from the security, comparing tax benefits to the section 12(2) deduction for income received. *See id.* at 652, 106 S.Ct. 3143. The court found that tax deductions or credits are not taxable events and cannot be classified as income. *See id.* at 657, 106 S.Ct. 3143. The court further observed that, although one purpose of the section 12(2) rescission remedy is to restore plaintiff to his position prior to the fraud, another purpose is to deter fraud and encourage full disclosure. *See id.* at 659, 106 S.Ct. 3143. The court observed it was more appropriate to allow the defrauded party to have the benefit of

a windfall than to let the fraudulent party benefit. *See id.* at 663, 106 S.Ct. 3143 (citing *Janigan v. Taylor*, 344 F.2d 781 (1st Circuit)), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Because any recovery would be taxable as ordinary income, the court believed arguments about a windfall were greatly overstated. 478 U.S. at 663–64, 106 S.Ct. 3143.

Although *Randall* did involve construction of securities fraud statutes, the damages allowed by the statutes included rescission and out-of-pocket damages. The rescission damages encompassed the consideration paid (with interest) less the amount of income received on the security. 478 U.S. at 655, 106 S.Ct. 3143 (citing 15 U.S.C. § 77*l* (2)). The out-of-pocket damages included the difference between the fair value received and the fair value of what the defrauded party would have received had there been no fraudulent conduct. *Id.* at 661–62, 106 S.Ct. 3143 (citing 15 U.S.C. § 78bb(a)). Although the court held that rescission adds an additional measure of deterrence as compared to a purely compensatory measure of damages, much of the reasoning supporting their ultimate conclusion is applicable to non-securities cases.

Although it involves a breach of contract claim, *Powers v. Powers*, 714 S.W.2d 384 (Tex.App.—Corpus Christi 1986, no writ), addresses an argument analogous to the one made by appellee in this case. In *Powers*, a woman sued her ex-husband for breach of an agreement to pay monthly alimony. *See id.* at 386. The trial court rendered judgment for the ex-wife for payment of the arrearage, costs, attorney's fees, and post-judgment interest. *See id.* On appeal, the ex-husband claimed the trial court erred in entering judgment against him because his ex-wife failed to offer any evidence by which to calculate her alleged damages. *See id.* at 388.

More particularly, the ex-husband claimed the measure of damages "should have been the amount of unpaid alimony less the tax savings she realized on her non-alimony income as a result of his failure to pay the entire amount of alimony due under the contract." *See id.* In other words, the ex-husband argued that his ex-wife's tax burden increased proportionately by the amount of alimony she received in a year, and the less alimony he paid, the more of a tax savings she realized. *See id.*

The court presumed the ex-husband's complaint went to mitigation of damages, in that he sought an offset for any tax savings realized by appellee. *See id.* at 389. First observing that the burden of proving the amount of damages that would have been mitigated was on the breaching party, the court concluded that they were "unaware of any principle or authority which would allow an offset to the party who has breached a contract for a 'tax savings' the non-breaching party 'realized' as a result of the breach." *Id.*

Only two other state courts have addressed deductibility of tax benefits from damages. In *DePalma v. Westland Software House*, 225 Cal.App.3d 1534, 276 Cal. Rptr. 214 (1990), the appellant challenged the trial court's refusal to admit evidence of tax benefits. Appellant asserted that, by not admitting this evidence, the trial court applied the collateral source rule and may have given the respondent a compensatory award exceeding statutory limitations. *See* 225 Cal.App.3d at 1538, 276 Cal.Rptr. 214. The court first held that the collateral source rule has never been extended to breach of contract and it was within the trial court's discretion to deny the appellant collateral source credit. *See id.* at 1539, 276 Cal.Rptr. 214. In addition to denying application of the collateral source rule, the court asserted three reasons for refusing to consider tax conse-

quences as a mitigating factor in compensatory damage calculations in breach of contract cases. *See id.* at 1540, 276 Cal. Rptr. 214. First, the court found that the federal tax benefits rule would cancel out most windfalls to plaintiffs in that the government may recapture past tax benefits awarded to a taxpayer if in a later year an event occurs which changes the basis of the premise upon which the deduction was originally based. *See id.* at 1540–41, 276 Cal.Rptr. 214. Second, the court observed that estimating tax consequences is speculative, time consuming, and confusing. *See id.* at 1541–42, 276 Cal.Rptr. 214. Finally, the court determined that public policy was better served if the breaching party was responsible for the full amount of compensatory damages. *See id.* at 1545, 276 Cal.Rptr. 214. The court felt so strongly about public policy that it stated it would reject appellant's argument even if there were no tax benefit rule. *See id.* The court cited to the Supreme Court's holding in *Randall*, in which the court had held it more appropriate to give the defrauded party the benefit of a windfall, and stated that the court likewise "favors parties who honor their promises, not those who breach them." *See id.* at 1546, 276 Cal.Rptr. 214.

The Supreme Court of Montana reached a similar result in a suit by a partnership of doctors against an accounting firm for failing to note the adverse impact the recommended reorganization and liquidation of a corporation would have on the partnership's industrial revenue bond financing. *See Billings Clinic v. Peat Marwick Main & Co.*, 244 Mont. 324, 797 P.2d 899 (1990). On appeal, the accounting firm claimed it was entitled to an offset for the tax benefits the individual doctors received by proceeding with reorganization. *See* 797 P.2d at 912. The district court refused to allow evidence of tax benefits. *See id.* at 913. The supreme court found no enti-

tlement to an offset for tax benefits because the objective of compensatory damages is to restore the damaged party to the position the party would have attained had the tort or breach not occurred. *See id.* The court added that, had the accounting firm done its job, the clinic would have had the benefit both of the tax benefits arising from the reorganization, and the lower cost of the favorable tax-exempt status of industrial revenue bonds. *See id.* The failure of this bond financing resulted in a higher interest cost for the loans required for construction of an addition to the clinic. *See id.* Thus, the court reasoned there would be no equity in reducing that higher cost by the tax benefits to which the clinic was otherwise by law entitled. *See id.*

In response to these cases, appellee cites to *Geeslin v. McElhenney*, 788 S.W.2d 683 (Tex.App.—Austin 1990, no writ), for the proposition that, in determining the amount of fee to which the executor is entitled, the trial court should balance the value of the executor's services against the harm done to the beneficiaries' interests. In *Geeslin*, the court found the trial court acted within its authority under section 241 of the Probate Code in reducing Geeslin's fee to 2.5% of the gross estate. *See id.* at 687. Although the court stated the reduced amount could reasonably be viewed as commensurate with the value of Geeslin's services balanced against the harm done to the interests of the beneficiaries, *Geeslin* did not involve a tax benefit offset. Accordingly, we find *Geeslin* distinguishable.

In the instant case, there was evidence of the deduction the estate took for the fee, the interest accrued from the delay in filing the return, the reduction in interest based on the fee deduction, and the accounting fees incurred during the years preceding final settlement of the estate tax debt. The jury obviously considered this evidence and decided that, regardless of the deduction afforded the estate, $2.2 million of the total fee taken was excessive and unreasonable.

Based on our review of case law and the record, we find the trial court erred in deducting $1.5 million from the jury's finding. First, no authority supports an offset for tax benefits. We are unpersuaded by appellee's argument that the trial court's offset should be upheld because the IRS can no longer assess additional estate taxes. Our concern is with the parties before this court. Furthermore, we agree with the policy discussed in *Randall* and *DePalma*. As the Supreme Court stated "... it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." 478 U.S. at 663, 106 S.Ct. 3143. Under the facts of this case, it is more appropriate for the estate to obtain the benefit of a windfall than to let appellee keep $1.5 million in fees the jury found was unreasonable.

■ We next turn to appellee's argument that the *Arce* case supports the trial court's ruling. The Texas Supreme Court has recently affirmed, in part, this court's opinion in the *Arce* case, recognizing fee forfeiture as a remedy for breach of fiduciary duty in the lawyer-client relationship. *See Burrow v. Arce*, 997 S.W.2d 229 (Tex.1999). Appellants argue that *Arce* is inapplicable because it concerns a remedy for breach of fiduciary duties other than the duty not to take an excessive fee, but we do not read such a limitation in *Arce*. Instead, we find that *Arce* applies to any breach of fiduciary duty case where the plaintiff pleads the equitable remedy of fee forfeiture. *See id.* at 246. A review of the petition in this case, however, reveals no specific pleading of the remedy of fee forfeiture. Instead, appellants sought actual damages in the form of excessive fees

taken by the executor. Neither side mentioned forfeiture in the trial court. Appellee did not argue that the claim of excessive fees was one within the trial court's discretion and did not cite any case law regarding the equitable remedy of forfeiture either during the charge conference or in his motion for judgment notwithstanding the verdict. During the charge conference, appellee did not object to the questions concerning the excessive fee and damages. In his motion for judgment notwithstanding the verdict, appellee argued the evidence was legally insufficient to support the finding or, alternatively, the estate did not suffer damages in the amount found by the jury.

Even a liberal reading of the petition does not reveal a request for a partial or total forfeiture of the executor's fee. Appellants clearly claimed that the taking of an unreasonable fee was in itself a breach of fiduciary duty. Because there was no pleading for the equitable remedy of forfeiture, we hold that *Arce* does not apply to this case.

Having found in favor of appellants on their first issue, we turn to appellee's first cross-point, claiming that the evidence is legally and factually insufficient to support the jury's finding of $2.2 million in unreasonable executor fees. In his argument, appellee considers the evidence relating to the factors articulated in *Arce* for use by the judge in determining the amount of fee to be disgorged. Because we have found *Arce* inapplicable to the facts of this case, we will not utilize these factors, but will instead review the record for evidence supporting the jury's finding that $2.2 million of the fee taken by appellee was unreasonable.

 Because the burden of proof was on appellants to show that the fee was unreasonable and excessive, appellee must show either that no evidence supports the jury's finding, or that factually insufficient evidence supports the jury's finding. When a "no evidence" challenge is raised, an appellate court may only consider the evidence and inferences supporting the jury's verdict, disregarding all contrary evidence. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). If there is more than a scintilla of evidence to support the finding, a no evidence challenge must fail. *See General Motors v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999). A scintilla of evidence exists when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). In application, we should find there is no evidence "if reasonable minds cannot differ from the conclusion that the evidence offered to support the existence of a vital fact lacks probative force." *Id.* An appellate court may not second-guess the jury unless only one inference may be drawn from the evidence. *See Ross v. Green*, 135 Tex. 103, 118, 139 S.W.2d 565, 572 (1940).

Appellants offered expert testimony from James P. Bevans, a certified property manager for 25 years and former regional manager of the Trust Department at NationsBank. Bevans testified that, to properly evaluate fees, he considered the size of the estate, the diversity of assets, and the complexity of administration, including tax considerations. Bevans observed that, based on his experience with comparable estates, an approximate fee of $300,000 would have been reasonable. After reviewing the estate and appellee's actions, Bevans concluded appellee was not entitled to any fee. In support of his opinion, Bevans offered the following: (1) appellee did not give the beneficiaries an accounting for 13 years; (2) appellee did not keep proper records; (3) 80–90% of the estate's assets were non-productive real estate and

the farms and ranches were operated at a loss for 20 years; (4) appellee did not transfer property to a trust for 18–20 years; (5) appellee took his fee while there was a huge IRS debt with interest continuing to accrue; and (6) appellee spent $750,000 on experts regarding development of a Westheimer tract when he had no experience in development. The record shows that, although his mother died in 1975, appellee did not fully fund the Article IV trust until 1984 and did not fund the Article V trust until 1995. Bevans stated that the $2.8 million fee was unbelievable and outrageous.

This testimony is some evidence supporting the jury's finding that the fees taken were excessive. Accordingly, we find no merit to appellee's claim of legally insufficient evidence to support this finding.

■■■■■ Appellee also claims the evidence is factually insufficient to support the jury's finding. In deciding factual sufficiency questions, the appellate court considers all of the evidence. *See Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986). The court may set aside the finding only if the evidence is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

In addition to considering the testimony of Bevans, we must also consider the evidence presented by appellee. Appellee testified that, in taking his fee, he considered the will language, which allows him to take a just and reasonable fee, and he considered an unidentified insurance publication showing fees for similar estates in Texas and other jurisdictions. Appellee testified it was his decision to take a range of fees, rather than a percentage of the value of the estate. Appellee took his fee in a series of payments from 1981–83 ranging in amounts from $5,000–375,000. Ap-

pellee conceded he did not prepare a written analysis of how he determined his fee and he kept no time records of his efforts. Appellee also agreed that he did not consult an attorney or conduct legal research about customary fees. Although he took the fee in the early 1980s, appellee testified that he knew the estate administration would continue for a long time.

Appellee also produced several witnesses that testified about the tax and interest savings the estate realized as a result of appellee's taking the $2.8 million fee. Gregory Edward Bardnell, a CPA, testified that approximately $2 million of the fee was deductible, meaning that the estate effectively paid only $850,000 of appellee's fee. Bardnell also testified that, had appellee merely paid the estate taxes and not paid himself a fee, the estate would have saved only $85,000 in interest on the IRS debt. Bardnell had no opinion of the reasonableness of appellee's fee.

Milton L. Schultz, an accountant who performed work for the estate, testified that deducting the executor fee and other administration expenses was his idea. Schultz added that he believed the fee was reasonable in light of the size of the estate and the difficulties of administration, including the lack of liquidity. Schultz characterized appellee's administration and ability to pay the taxes and preserve the bulk of the estate as "nothing short of genius."

We find that the evidence supporting the jury's finding is not so weak that the finding is clearly wrong and manifestly unjust. Based on the evidence presented by Bevans, the jury could have determined that appellee was entitled to no fee. Instead, the jury determined that appellee was entitled to approximately $600,000, which is approximately 5% of the estate value at the time of Katherine Barnhart's

death. We refuse to second-guess the jury when there is ample evidence of improper and unacceptable actions by appellee as executor. We overrule cross-point one.

### Failure to Sell Westheimer and Pasadena Properties

■ Appellants next challenge the trial court's decision to disregard the jury findings that appellee breached his fiduciary duties by failing to sell the Westheimer and Pasadena properties. By cross-point, appellee claims the evidence is legally and factually insufficient to support the jury's findings in questions 1(a)-(b) and 3.

Question 1(a) asked the jury whether appellee breached his fiduciary duty by failing to sell the Westheimer property. Question 1(b) asked whether appellee breached his fiduciary duty by failing to sell the Pasadena property. Question 3 asked the jury the date appellee reasonably should have sold the properties, the dollar amount of proceeds that would have been received from such a sale, and the dollar amount of proceeds that would be received if the property were sold today. In response to questions 1(a) and (b), the jury found that appellee breached his fiduciary duty by failing to sell the two properties. In response to question 3, the jury found the Westheimer property should have been sold in May 1981, the proceeds from such a sale would have been $42 million, and the proceeds if sold today would be $24.5 million. As to the Pasadena property, the jury found the property should have sold in July 1978, the proceeds from such a sale would have been $1.6 million, and the proceeds, if sold today, would be $2,485,500.

In his motion for judgment notwithstanding the verdict, appellee argued that there was no evidence to support the jury's findings in response to questions 1(a), 1(b), and 3. The trial court agreed with appellee's legal insufficiency argument and disregarded the answers to jury question 1(a)-(b) and 3.

■ Appellants first assert that appellee invited or waived error because appellee requested question 3, but we find nothing in the record indicating that appellee requested this question. Appellants next argue waiver because appellee's attorneys objected to the damages measure sought by appellants. Appellants sought a measure of damages that included potential profits had Appellee timely sold the properties and invested the sale proceeds in a diversified portfolio of stocks and bonds. Appellee disagreed with this measure, and argued the proper measure was sales proceeds plus interest.

Appellee's disagreement with appellants' measure of damages did not invite or waive the error complained of here. Appellee offered the testimony of Professor Johanson, who rejected appellants' proposed measure as improper and testified that the proper measure was sale proceeds plus interest. Appellee was not advocating sale proceeds as the proper measure of damages, but was countering appellants' proposal for damages to include lost profits. We do not find appellee's objection and offer of testimony to constitute invited error.

■ Appellants also argue that appellee invited or waived error by statements made during jury deliberations. The jury sent a question to the trial judge regarding the part of question 3 asking the date appellee should have sold the Westheimer and the Pasadena properties. The jury asked whether "date" referred to year, or month and year. The trial judge told the parties he replied "month and year," and asked the attorneys if they had any objections to this reply. Appellee's attorneys objected and asked that the reply inform

the jury that they must give the day, month, and year. Rather than objecting to "month and year," appellants' attorneys stated: "We can take it from the end of the month if that's going to be their problem. I think that's narrowing in too specifically." The court decided to let the jury answer month and year.

The statement of appellants' counsel during this discussion indicates they acquiesced in the "month and year" reply. Furthermore, this discussion does not show that appellee's counsel requested "month and year." Rather, this was the suggestion of the trial judge. We do not find that appellee's counsel invited error by asking for more specificity than the judge.

Likewise, appellee did not waive error by failing to object to question 3 on the ground of insufficient evidence. A party may challenge legal sufficiency for the first time after the verdict regardless of whether the submission of the question was requested by the complainant. *See* Tex.R. Civ. P. 279. By asserting in its motion for judgment notwithstanding the verdict that the evidence supporting the jury's findings was legally insufficient, appellee preserved this complaint for appellate review. *See id.*

Having found no waiver or invited error, we turn to appellants' challenge to the disregarding of the jury answers. A trial court may disregard a jury's finding if there is no evidence to support the jury's finding. *See Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593(Tex.1986). In reviewing the grant of a motion for judgment notwithstanding the verdict, the reviewing court must review all testimony in a light most favorable to the finding, considering only the evidence and inferences that support the finding and rejecting the evidence and inferences contrary to the finding. *See*

*Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). If there is more than a scintilla of competent evidence to support the jury's finding, then the judgment notwithstanding the verdict will be reversed. *See Mancorp v. Culpepper,* 802 S.W.2d 226, 228 (Tex.1990).

Appellee claims questions 1 and 3 did not, as appellants suggest, ask whether he breached a duty to diversify assets, transform nonproductive assets into productive assets, and generate income, but instead, asked the jury whether appellee breached a duty to accept two specific offers. Appellee asserts there is no evidence supporting a finding that he had a duty to accept a May 1981 offer to purchase the Westheimer property or a July 1978 offer to purchase the Pasadena property. Appellee further argues there is no evidence that any sales pursuant to these two offers would have yielded the proceeds found by the jury.

Although the evidence reveals a number of unaccepted offers for the Pasadena and Westheimer properties, the jury's finding of breach in May 1981 for the Westheimer property relates to a May 1981 offer by a Mr. Carothers. The date found by the jury of July 1978 for the Pasadena property relates to the July 1978 offer for the Pasadena property made by U.S. Homes. By failing to object to the jury question requesting the month and year appellee should have sold the two properties, appellants acquiesced in the jury finding a date that related to specific offers.

The evidence showed the Westheimer property did not have high-density sewer capacity and appellee testified that he delayed the sale of this property because he knew it would be worth more if it had sewer capacity In May 1981, Mr. Carothers offered to purchase part of the Westheimer property for more than $40 million.

Appellee did not respond to this offer because he believed it was a poor proposal in that it required high-density sewer capacity and it included no payment for the portion of the property that was in the flood plain. Appellee conceded that he did not attempt to negotiate either offer. Neither Carothers nor his principal, Loh, testified whether they would have accepted a modified arrangement regarding the Westheimer property.

The evidence further showed that, in July 1978, U.S. Homes offered $1.5 million for the Pasadena property, and later raised that offer to $1.64 million. Appellee testified he rejected this offer because it was not a cash offer. No representative from U.S. Homes testified. Therefore, there is no evidence that, had appellee negotiated, U.S. Homes would have accepted a modified arrangement regarding the Pasadena property. Appellants' expert, Lucian Morrison, testified that appellee should have responded to the offers and negotiated for different terms than those in the original offers. Morrison did not state that appellee should have accepted the original offers from U.S. Homes or Carothers.

■ Texas courts have long held that unaccepted offers to purchase property are no evidence of market value of property. *See Hanks v. Gulf, Colorado & Santa Fe Ry. Co.*, 159 Tex. 311, 320 S.W.2d 333, 336–37 (1959); *Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 762 (Tex.App.—Corpus Christi 1988, writ denied). The courts have found this evidence uncertain and speculative. *See Hanks*, 320 S.W.2d at 337. Evidence of an unaccepted offer does not establish the good faith of the person making the offer. *See id.*

If unaccepted offers are too uncertain to serve as proof of the market value of a parcel of property, they are likewise too uncertain to serve as proof of the dollar amount of proceeds appellee would have obtained if he had sold the two properties on the dates found by the jury. Because the jury was advised to find a month and year when the properties should have been sold, the jury necessarily focused on the dates of specific offers and unaccepted offers are no evidence of the dollar amount of proceeds appellee would have received had he sold the properties. Accordingly, we find no error by the trial court in disregarding the jury's answers to questions 1(a), 1(b), 3(a), and 3(b). Having found no error in the trial court's actions, we need not reach appellee's cross-point.

## Removal of Appellee as Executor and Trustee

■ Appellants next challenge the trial court's refusal to remove appellee as executor and trustee. Appellants also complain of the trial court's refusal to submit requested questions relating to removal.

Appellants initially raise an issue of statutory construction. Appellants contend that, because the supreme court has construed section 113.082 of the Trust Code as mandatory in nature, we should likewise construe section 149C of the Probate Code as mandatory because the language in these two statutes is similar. Section 149C of the Probate Code states that a trial court may remove an independent executor on the following grounds:

(1) the independent executor fails to return within ninety days after qualification, unless such time is extended by order of the court, an inventory of the property of the estate and list of claims that have come to his knowledge;

(2) sufficient grounds appear to support belief that he has misapplied or embezzled, or that he is about to mis-

apply or embezzle, all or any part of the property committed to his care;

(3) he fails to make an accounting which is required by law to be made;

(4) he fails to timely file the notice required by Section 128A of this code;

(5) he is proved to have been guilty of gross misconduct or gross mismanagement in the performance of his duties; or

(6) he becomes an incapacitated person, or is sentenced to the penitentiary, or from any other cause becomes legally incapacitated from properly performing his fiduciary duties.

Tex. Prob.Code Ann. § 149C (Vernon Supp. 2000).

Section 113.082 of the Property Code governs removal of a trustee. This section states a court may remove a trustee and deny part or all of the trustee's compensation if:

(1) the trustee materially violated or attempted to violate the terms of the trust and the violation or attempted violation results in a material financial loss to the trust;

(2) the trustee becomes incompetent or insolvent; or

(3) in the discretion of the court, for other cause.

Tex. Prop.Code Ann. § 113.082(a) (Vernon 1995).

In reviewing a trial court's removal of a trustee under a prior version of section 113.082, the supreme court held that removal was not discretionary with the trial court, despite the use of the word "may." See Akin v. Dahl, 661 S.W.2d 911, 913 (Tex.1983). Because the supreme court has found removal mandatory under section 113.082,[4] appellants argue removal should also be mandatory under section 149C. Absent any clear directive from the supreme court, however, we decline appellants' invitation to construe the clear language of section 149C to find that removal of an executor is mandatory.

### 1. Removal as Executor

Appellants contend the trial court's decision not to remove appellee as executor constituted an abuse of discretion because the evidence shows appellee did not timely file an inventory, misapplied property committed to his care, failed to timely file a proper accounting, and was found to have breached his fiduciary duty in numerous respects. A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles. See Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex.1997).

Gross misconduct or gross mismanagement is a ground for removal of an executor. See Tex. Prob.Code Ann. § 149C (Vernon Supp.2000). In Geeslin v. McElhenney, 788 S.W.2d 683 (Tex.App.—Austin 1990, no writ), the court reasoned that the statutory terms "gross mismanagement" and "gross misconduct" do not encompass ordinary negligence. Nonetheless, the court recognized that an executor owes the duties of a trustee:

He holds property interests, not his own, for the benefit of others. He manages those interests under an equitable obligation to act for the others' benefit and not his own. He is a "fiduciary" of whom the law requires an unusually high standard of ethical or moral conduct in reference to the beneficiaries and their interests. His "duties" are more than the ordinary "duties" of the marketplace. They connote fair dealing, good faith, fidelity, and integrity. He may have addi-

---

4. We address the Akin holding in further detail later in this opinion.

tional duties that he would not have in an ordinary business relation—a duty of full disclosure, for example, and a duty not to use the fiduciary relationship for personal benefit except with the full knowledge and consent of the beneficiaries. "It is against public policy to allow persons occupying fiduciary relations to be placed in positions in which there will be constant danger of a betrayal of trust by the vigorous operation of selfish motives."

Thus, the statutory criteria ("gross mismanagement" and "gross misconduct") are necessarily elastic. They must be sufficiently narrow to exclude ordinary negligence, yet sufficiently broad to include a fiduciary's breach of his higher and additional duties, some of which might not even exist absent the fiduciary relationship.

*Id.* at 684–85. The court concluded that gross misconduct or mismanagement, at a minimum, includes: "(1) any willful omission to perform a legal duty; (2) any intentional commission of a wrongful act; and (3) any breach of a fiduciary duty that results in actual harm to a beneficiary's interest." *Id.* at 685 (emphasis omitted).

In determining whether the trial court abused its discretion, the *Geeslin* court held there were seven legally relevant factors to consider:

(1) the higher quality of ethical and moral conduct implicit in Geeslin's fiduciary status;

(2) the degree of harm sustained by the beneficiaries' interest, owing to Geeslin's conduct;

(3) the public policy in favor of independent administration, due to the salutary purposes served by that method of administration;

(4) the sufficiency of a bond to protect the beneficiaries' interest if a bond is given under section 149 of the Probate Code;

(5) the complexity of the estate;

(6) whether Geeslin's acts and omissions resulted from professional advice, or whether they occurred in the face of such advice; and

(7) the distinction between willful conduct and inadvertent acts and omissions generally.

*Id.* In applying these factors, the *Geeslin* court upheld the trial court's removal of the executor because (1) Geeslin knew about an additional estate tax liability, and did not act to limit the interest and penalty, but paid himself commissions and paid other estate obligations; and (2) Geeslin used estate funds to pay pension-plan liabilities and used estate funds to make terminating distributions to pension-plan participants. *Id.* at 686–87. The court noted that Geeslin commingled funds despite warnings from his attorney and accountant that commingling might be prohibited. *See id.* at 687.

Appellee claims appellants misread *Geeslin* and that it does not hold the trial court may remove an executor for breach of a fiduciary duty that results in actual harm. Indeed, appellee argues that, because *Geeslin* does not so hold, the trial court properly denied appellants' requested questions. Appellee reasons that if a breach of duty resulting in harm were sufficient to support removal, any minor breach could constitute gross misconduct. We disagree with appellee's reasoning. Although *Geeslin* does state that a breach of fiduciary duty resulting in actual harm to a beneficiary's interest may be sufficient to constitute gross misconduct, this holding is tempered by the application of seven factors for the court to consider in determining whether a breach of fiduciary duty resulting in harm should result in removal. *See id.* at 685. We believe appellee's fears

about removal for minor infractions are unfounded. Consideration of the seven factors would, in our opinion, allow a trial court to determine whether the breach of fiduciary duty is of sufficient magnitude to merit removal of the executor.

We also disagree with appellee's statement that the trial court denied appellants' requested question 11 because he disagreed with appellants' interpretation of *Geeslin*. Appellants submitted the following question: "Did Ronald Lee grossly mismanage any part of the property committed to his care as executor?" In refusing to submit these questions, the trial judge stated:

> THE COURT: The instructions and questions submitted as Plaintiff's A through F are denied. I will say on the record what I have said off the record, and that is that there's a finding of either gross negligence or a breach of fiduciary duty and damage. I would find that under the Probate Code to be grounds for removing the trustee, anyway. And so I don't think those questions, those particular ones, are necessary.

When denying appellants' requested question, the trial judge stated the question was unnecessary because the removal question could be answered from the jury's responses to questions regarding breach of fiduciary duty or gross negligence. The trial judge's statement is consistent with our interpretation of *Geeslin*.

Based on *Geeslin*, the trial court could have considered the jury's findings regarding breaches of fiduciary duty in making his decision regarding removal, either as executor or as trustee. The jury's failure to find gross negligence does not, as appellee strongly argues, preclude removal, but we may consider it in reviewing the trial court's ruling.

The evidence showed, and appellee admits, he did not file an accounting in a timely manner. The jury found breaches of fiduciary duty by appellee in the failure to sell the Westheimer property, failure to sell the Pasadena property, in the mismanagement of the River Bend Farm and Cap Rock Ranch, and in the expenditure of estate funds on the attempted Knollwood development. Because we have upheld the trial court's decision to disregard the jury's findings relating to the Westheimer and Pasadena properties, the court could not consider these breaches of duty in considering whether to remove appellee as executor. As to the findings regarding River Bend Farm and Cap Rock Ranch, the jury only found damages to the estate of $1.00 for each. As to the expenditure of estate funds with respect to Knollwood, the jury found damages of $840,000. The jury also found unreasonable fees of $2.2 million.

Because there were findings of breaches of fiduciary duty and substantial actual damages, we must determine whether, in light of the seven *Geeslin* factors, the trial court abused its discretion in refusing to remove appellee as executor. We begin with the overall consideration that appellee's position as executor, being fiduciary in nature, requires that we hold appellee to a higher ethical and moral standard. This consideration must be tempered, however, by consideration of the public policy in favor of independent administration and the undisputed complexity of this estate. Of equal importance, are the substantial damages to the beneficiaries' interest. The damages for excessive fees and for the failed Knollwood development total more than $3 million. Appellee did not consult professionals with respect to the amount of fees he took, but he did consult some professionals concerning the Knollwood development. Indeed, many of the expenses involved with Knollwood are those

of professionals appellee consulted. Finally, we must consider whether appellee's actions were willful or inadvertent. The jury did not find that appellee's actions constituted gross negligence. Nonetheless, the evidence does not indicate that appellee's taking of an excessive fee or his excessive expenditures on the Knollwood development were merely inadvertent acts.

 Although the trial judge is given discretion by statute to determine whether an executor's actions rise to the level of gross misconduct, this discretion is not unlimited. An abuse of discretion occurs when the trial court makes a legally unreasonable determination given the factual-legal context in which it was made. *See Landon v. Jean–Paul Budinger, Inc.,* 724 S.W.2d 931, 939 (Tex.App.—Austin 1987, no writ). In other words, the trial court's determination is legally unreasonable if the court failed to consider a fact shown in the evidence that was legally relevant. *See id.* at 939–40.

In this case, we cannot say that the trial court necessarily failed to consider any of the *Geeslin* factors. While we may not have reached the conclusion the trial court made in light of the factors, this is not the standard. Having considered the statute, the *Geeslin* factors, and the evidence, we cannot say the trial court abused its discretion in refusing to remove appellee as executor.

**2. Removal as Trustee**

Grounds for removal of a trustee under section 113.082 include a material violation or an attempt to violate the terms of the

trust that results in a material financial loss to the trust. *See* TEX. PROP.CODE ANN. § 113.082(a)(1) (Vernon 1995). Appellants requested a question (question 13) very similar to the language of the statute: "Did Ronald Lee grossly mismanage or materially violate the terms of the Article IV Trust resulting in a material financial loss to that trust?" The trial judge refused to submit appellants' requested question because the judge believed he could make the determination of mismanagement or material violations from the submitted questions regarding breaches of fiduciary duty and gross negligence.[5] Appellants claim the refusal to submit requested question 13 was reversible error.

 Rule 278 provides that the court must submit questions raised by the written pleadings and evidence. *See* TEX.R. CIV. P. 278. *See also Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992) (interpreting Rule 278 as a nondiscretionary directive). The decision whether to submit a particular instruction or definition is reviewed for an abuse of discretion. *See State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 451 (Tex.1997). To determine whether an alleged error in the charge is reversible, the reviewing court must consider the pleadings, the evidence, and the charge in its entirety. *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). As to instructions and definitions, the essential question is whether the instruction aids the jury in answering the questions. *See Harris v. Harris,* 765 S.W.2d 798, 801 (Tex.App.— Houston [14th Dist.] 1989, writ denied).

**5.** In his response brief, appellee claims that the trial court "determined that 'cause' would exist to remove if the jury had found gross negligence." Appellee then states that appellants did not complain below and do not complain on appeal that gross negligence is not a legally valid basis for removal. Because the jury refused to find gross negli-

gence, appellee reasons the trial court properly declined to remove appellee as trustee. Appellee misrepresents the trial court's determination. The trial court actually said he could find grounds for removal if there was a finding of *either* gross negligence or breach of fiduciary duty and damages.

An instruction is proper if it assists the jury, is supported by the pleadings or evidence, and accurately states the law. *See Perez v. Weingarten Realty, Investors,* 881 S.W.2d 490, 496 (Tex.App.—San Antonio 1994, writ denied). Whether terms are properly defined or the instruction properly worded is a question of law reviewable de novo. *See M.N. Dannenbaum, Inc. v. Brummerhop,* 840 S.W.2d 624, 631 (Tex. App.—Houston [14th Dist.] 1992, writ denied). Error is reversible only if, when viewed in light of the totality of the circumstances, the refusal to submit a question or instruction probably caused the rendition of an improper judgment. *See St. James Transp. Co. v. Porter,* 840 S.W.2d 658, 664 (Tex.App.—Houston [1st Dist.] 1992, writ denied); TEX.R.APP. P. 44.1(a)(1).

 Because appellants pled for removal of appellee as trustee under section 113.082, and presented evidence of actions the jury found to be breaches of fiduciary duty, we hold that the issue of removal under the statute was a valid theory raised by the pleadings and evidence. Although appellants requested a question regarding a statutory ground for removal, appellee claims appellants "are not true to the record when they tell this Court that they asked the trial court to submit a question to the jury in language substantially identical to the specific statutory ground for removal of trustee under § 113.082...." Appellee argues that requested question 13 would have negated the statutory requirement of a material violation giving rise to a material financial loss by permitting the jury to answer "yes" if it found any breach of fiduciary duty resulting in harm or a material violation resulting in material harm. We disagree.

Requested question 13 asked the jury to determine whether appellee grossly mismanaged or materially violated the terms of the Article IV Trust resulting in a material financial loss to that trust. The instruction to that question stated: "You are instructed that 'gross mismanagement' means any breach of a fiduciary duty that results in actual harm to a beneficiary's interest." Rather than appellee's more tortured construction of this question, we read this question to allow the jury to answer "yes" if the jury found a material financial loss suffered by the trust as a result of either: (1) a breach of fiduciary duty that resulted in actual harm; or (2) a material violation of the Article IV Trust. In other words, we believe the question presents "gross mismanagement" and "material violation of the Article IV Trust" as the two types of actions by a trustee that could result in a material financial loss to the trust. Therefore, this question substantially tracks the language of section 113.082.

In reviewing appellee's brief, we note that some of appellee's defensive arguments tend to support appellants' claim that the trial court should have submitted the requested question 13. Appellee argues in his brief that "whether a breach of duty is a 'material violation' and whether a financial loss is 'material' are necessarily fact questions...." Appellee continues, "the finding that expenditures on Knollwood were $840,000 too much cannot substitute for the missing fact finding that those expenditures constituted a material violation resulting in a material loss." As to the executor's fee, appellee observed that fact issues as to materiality of the breach and the loss are not conclusively established. As to the late filing of the inventory or the delay in providing an accounting, appellee reasons that, even if these items were undisputed, they "cannot substitute for the missing fact finding that any such breaches constituted a material violation causing any material loss."

Nonetheless, we believe the trial judge's reasoning was correct when he stated he could determine removal from jury answers regarding breach of fiduciary duty or gross negligence. We agree with the trial court that breaches of fiduciary duty can constitute material violations of the trust. Furthermore, we believe that jury awards of damages for breaches of fiduciary duty can constitute a material financial loss to the trust. Accordingly, we find no error by the trial court in refusing to submit requested question 13.

Even without submission of requested question 13, there are jury findings of breach of duty that the trial court should have found to be material violations of the trust. These include the jury's finding of breach of fiduciary duty with respect to the expenditures on the Knollwood development and the taking of an excessive fee. There are also jury findings of substantial damages, including $840,000 for Knollwood expenditures, and $2.2 million in excessive fees, that constitute, as a matter of law, material financial losses to the trust.

Appellants argue that removal is mandatory if there is a material violation resulting in a material financial loss to the trust. Indeed, the supreme court appears to hold that removal is not discretionary. *See Akin v. Dahl*, 661 S.W.2d 911, 913 (Tex. 1983). Appellee rejects this interpretation of *Akin* and claims that *Akin* merely notes, in dicta, that removal is mandatory for an enumerated statutory ground. We are unpersuaded that we may ignore the court's holding as merely dicta.

In *Akin*, the trial court had removed the trustee pursuant to jury findings that the trustee had developed such hostility toward certain beneficiaries that his deci-

sions as trustee in administering the trust funds would probably be influenced adversely to those beneficiaries' interests. 661 S.W.2d at 912. There was also a finding that the trustee had acted improperly with trust funds. *See id.* at 913. The court of appeals reversed, holding that removal was not warranted. *See id.* at 912. In the supreme court, a beneficiary argued that former section 39 of the Texas Trust Act (now section 113.082) [6] allowed removal of a trustee to be discretionary and that the appropriate standard of review was the "arbitrary and unreasonable" standard. *See id.*

Although the former statute provided (and the current statute continues to provide) that a trustee *may be removed* for a ground specified in the statute (material violation of trust resulting in material financial loss, incompetence, or insolvency) or "for other cause, in the discretion of the court having jurisdiction," the *Akin* court found that this statute "does not make removal of a trustee a discretionary act on the part of the trial court and hence subject upon review to the 'arbitrary and unreasonable' standard." *See id.* The court observed that the portion of the statute allowing removal for other causes "in the discretion of the court having jurisdiction," was meant to insure that the grounds of removal were not expressly limited to those enumerated, but may include others that the trial court, in its discretion, deems proper. *See id.*

Because no issue was submitted to the jury regarding improper conduct or mismanagement by the trustee, and such conduct was not established as a matter of law, the *Akin* court found that removal for mismanagement of trust funds was not

---

6. The former statute has been rewritten upon codification to set out the grounds in an enumerated fashion; however, the language of the statute remains the same. *Compare* Act of April 14, 1993, 48th Leg., R.S., ch. 148, § 39, 1943 Tex. Gen. Laws 232, 246 (repealed) *with* TEX. PROP.CODE ANN. § 113.082 (Vernon 1995).

warranted. *See id.* As for the jury findings regarding trustee hostility, the court first noted that ill will or hostility, standing alone, was an insufficient ground for removal. *See id.* The court then stated:

> Article 7425b–39 [now section 113.082] of the Texas Trust Act sets out circumstances which warrant the removal of a trustee from office. Should the trier of fact affirmatively find that one of the enumerated circumstances has occurred, the trustee *will be removed.* Additionally, should the trier of fact find that hostility, ill will, or other factors have affected the trustee so that he cannot properly serve in his capacity, the trustee *will be removed.*

*See id.* at 914 (emphasis added). We understand this passage to mean that a trustee will be removed if the trier of fact finds the evidence shows the trustee has committed one of the enumerated acts or one of the acts, not enumerated, but which the trial court, in its discretion, deemed a proper ground for removal.

Although the jury in *Akin* had found the trustee's hostility "probably" would affect his performance, the supreme court held this finding was insufficient to support removal. *See id.* Instead, the court held that there had to be a finding that the trustee's hostility *does or will* affect his performance as a trustee. *See id.* Accordingly, the court's discussion of removal for an enumerated ground could be construed to be dicta. Nonetheless, the court also states that a trustee "will be removed" for hostility, a ground not enumerated, but found by the trial court in its discretion to be a proper ground for removal. *See id.*

By saying "will be removed," rather than "may be removed," the court construes the statute to be mandatory and not discretionary. Although the court's statement was unnecessary to the holding, we construe this statement to be judicial dictum deliberately made for guidance of the bench and bar and, therefore, binding on lower courts. *See Ex parte Harrison,* 741 S.W.2d 607, 609 (Tex.App.—Austin 1987, orig. proceeding). Although we disagree with the *Akin* court's construction because the plain language of the statute is discretionary in nature, we are constrained to follow supreme court precedent.

■ Appellants also argue appellee has a conflict of interest that requires his removal. The alleged conflict arises from appellee's opposition to appellants' motion for judgment and his attempt to reduce the trust's judgment. Such a conflict could arise anytime a beneficiary brought suit for damages against a trustee. Therefore, we decline to find a conflict of interest under these circumstances. Because we find that the breaches of duty found by the jury and the total of $3 million in damages constitute a material violation of the trust resulting in a material financial loss, we hold the trial court had a mandatory duty to remove appellee as trustee. Accordingly, the trial court erred in refusing to remove appellee as trustee.

### Bad Faith Defense

■ Appellants next claim the trial court erred in not requiring appellee to bear his own attorney's fees and costs because the jury found appellee defended the lawsuit in bad faith. Section 149C permits an independent executor to recover necessary expenses, including attorney's fees, if he or she defends an action for removal in good faith. TEX. PROB.CODE ANN. § 149C (Vernon 1980). In granting appellee's motion for judgment notwithstanding the verdict, the trial court disregarded the answer to question 8, finding that appellee defended the suit in bad faith. In a cross-point, appellee claims there was legally and factually insufficient

evidence to support the jury's finding that he defended this lawsuit in bad faith.

Appellee argues that, even if there is a finding of bad faith defense, an executor is entitled to attorney's fees where he prevails against attempted removal. In support of this argument, appellee cites *Miller v. Anderson*, 651 S.W.2d 726 (Tex.1983). In *Miller*, the court was construing section 243 of the Probate Code, which allows an executor to recover from the estate his necessary expenses, including reasonable attorney's fees, when the executor defends the will in good faith, and "with just cause, for the purpose of having the will or alleged will admitted to probate, whether successful or not...." Tex. Prob.Code Ann. § 243 (Vernon Supp.2000). The supreme court upheld the trial court's award of attorney's fees to the executor even though there was no affirmative finding of good faith. *See* 651 S.W.2d at 728. The court observed that in prior cases, where the wills were denied probate, a showing of good faith and just cause was necessary to show a benefit to the estate compensable under section 243. *See id.* (citing *Russell v. Moeling*, 526 S.W.2d 533 (Tex.1975) and *Huff v. Huff*, 132 Tex. 540, 124 S.W.2d 327 (Tex.1939)). The *Miller* court found that a benefit to the estate was proven when the will was admitted to probate.[7] 651 S.W.2d at 728.

Section 243 is phrased similarly to section 149C, which provides that an executor "who defends an action for his removal in good faith, whether successful or not, shall be allowed out of the estate his necessary expenses and disbursements, including

reasonable attorney's fees...." Tex. Prob. Code Ann. § 149C(c) (Vernon 1980). Although the language of the two statutes is somewhat similar, we are unconvinced that the holding in *Miller* applies to the facts of this case. In *Miller*, there was no finding of good faith and the supreme court held that the lack of this finding did not prevent recovery of attorney's fees. 651 S.W.2d at 728. Holding that a finding of good faith is unnecessary under certain circumstances does not inescapably lead to the conclusion that an affirmative finding of bad faith should be ignored. We cannot say that, based on its holding in *Miller*, the supreme court would disregard an affirmative jury finding of bad faith. Although appellee was successful in avoiding removal as an executor, removal was a discretionary determination made by the trial judge. In addition to finding many breaches of fiduciary duty by appellee, the jury found that appellee had defended the lawsuit in bad faith.

█ Although a trustee may also be removed under section 113.082 of the Property Code, there is no "good faith" requirement in the statute allowing recovery of fees. Section 114.064 provides that the court "may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." Tex. Prop.Code Ann. § 114.064 (Vernon 1995). Thus, the grant or denial of attorney's fees to a trustee is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's judgment absent a clear showing that the trial court abused its discretion by acting

7. This holding seems to fly in the face of the plain language of the statute. The statute allows recovery of attorney's fees if the executor defends the will in good faith and with just cause, whether or not he or she is successful in admitting the will to probate. *See* Tex. Prob.Code Ann. § 243 (Vernon Supp.2000). Although the recovery of fees is expressly not tied to success in admitting the will to probate, it is tied to good faith defense. By holding that a finding of good faith was inapplicable where the executor was successful in admitting the will to probate, the court ignored the statutory language and tied recovery of fees to success in admitting the will.

without reference to any guiding rules and principles. *See Lyco Acquisition 1984 Ltd. v. First Nat'l Bank,* 860 S.W.2d 117, 121 (Tex.App.—Amarillo 1993, writ denied). Because removal of a trustee does not require a good faith finding, the jury question in the instant case only concerns appellee's entitlement to recover attorney's fees as an executor.

As stated previously, a trial court may disregard a jury's finding if there is no evidence to support the jury's finding. *See Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593 (Tex.1986). In reviewing the grant of a motion for judgment notwithstanding the verdict, the reviewing court must review all testimony in a light most favorable to the finding, considering only the evidence and inferences that support the finding and rejecting the evidence and inferences contrary to the finding. *See Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). If there is more than a scintilla of competent evidence to support the jury's finding, then the judgment notwithstanding the verdict will be reversed. *See Mancorp v. Culpepper,* 802 S.W.2d 226, 228 (Tex.1990).

In support of the jury finding of bad faith defense against removal, appellants cite generally to the five weeks of testimony regarding appellee's conduct, including the amount of the executor fee taken, the estate's need for cash at the time appellee took the fee, the failure to provide a proper accounting, the use of estate funds to pay personal expenses, and the failure to transfer the estate's assets to its beneficiary until 19 years after his mother's death. Although this testimony supports liability as to breach of fiduciary duty, it does not necessarily support a finding that appellee defended this lawsuit in bad faith. Rather, to support the jury's finding, there must be some evidence that appellee's defense against removal was in bad faith.

Although the jury charge phrased the "good faith" requirement negatively, we construe the jury's affirmative finding to be a finding that appellee did not defend against removal in good faith. The jury charge did not define "bad faith." The statute, which includes the "good faith" requirement, also contains no definition of "good faith." Furthermore, we have discovered no case law addressing the meaning of "good faith" under this statutory provision.

In different contexts, "good faith" can be a subjective or an objective standard. For example, under the Texas Business and Commerce Code, "good faith" is defined as honesty in fact. *See* Tex. Bus. & Com.Code Ann. § 1.20(19) (Vernon Supp.2000). The Texas Supreme Court has held that the test for good faith is the actual belief of the party and not the reasonableness of that belief. *See La Sara Grain v. First Nat'l Bank,* 673 S.W.2d 558, 563 (Tex. 1984); *Holeman v. Landmark Chevrolet Corp.,* 989 S.W.2d 395, 399 (Tex.App.— Houston [14th Dist.] 1999, writ denied). Unlike this subjective standard, the courts have adopted an objective standard where official immunity is asserted. *See City of Lancaster v. Chambers,* 883 S.W.2d 650, 656 (Tex.1994). The supreme court observed that this test, like the test under federal immunity law, is one of objective reasonableness, without regard to whether the official acted with subjective good faith. *See id.* This objective standard provides that an officer acts in good faith in a pursuit case if "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Id.*

Under other circumstances, a combination of subjective and objective standards has been found appropriate. In the con-

text of a whistle blower action, the supreme court considered the public and private concerns involved and the subjective and objective standards of "good faith," and decided on a combination of the two standards. *See Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex.1996). The court held that "good faith" in the whistle blower context means that: "(1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience." *Id.* In reaching this holding the court considered the United States Supreme Court's discussion of objective and subjective standards for "good faith" in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

In *Wood*, the Court addressed whether an objective or subjective standard should apply in a section 1983 action where the school official claimed immunity. *See id.* at 314–15, 95 S.Ct. 992. The court held:

> The disagreement between the Court of Appeals and the District Court over the immunity standard in this case has been put in terms of an "objective" versus a "subjective" test of good faith. As we see it, the appropriate standard necessarily contains elements of both. The official himself must be acting sincerely and with a belief that he is doing right, but an act ... can be no more justified by ignorance or disregard of settled, indisputable law ... than by the presence of actual malice.

*Id.* at 321, 95 S.Ct. 992.

The standards referenced in Rule 13 are particularly illuminating. Rule 13 provides that an attorney or party's signature on a

pleading constitutes a certificate by them that "to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment." Tex.R. Civ. P. 13. Under this rule, courts presume pleadings are filed in good faith and will not impose sanctions absent good cause, the particulars of which must be set out in the order. *See id.* "Groundless," in the context of Rule 13, means "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.*

In the context of an action to remove an executor, we believe we must balance the interests of the beneficiaries with the public policy in favor of independent administration. We must protect the beneficiaries' interest in the estate proceeds. At the same time, we must preserve an executor's ability to fulfill the obligations of the position, exercising judgment in handling the often complicated decisions involved in administration of an estate. Accordingly, we believe a fair balancing of these interests is achieved by adopting a standard of good faith that combines the subjective and objective tests. We hold that an executor acts in good faith when he or she subjectively believes his or her defense is viable, if that belief is reasonable in light of existing law. This standard should protect all but the plainly incompetent executors or those who willfully breach their fiduciary duties.[8]

The record contains much evidence regarding appellee's breaches of duty, but appellants do not point to, and we have not located, any evidence showing that appel-

8. This is somewhat similar to the standard for official immunity, which has been held to protect "all but the plainly incompetent or those who knowingly violate the law." *Cour-* son v. McMillian, 939 F.2d 1479, 1487 (11th Cir.1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

lee's *defense* against removal was made in bad faith. We have located no evidence that appellee subjectively believed his defense was in bad faith and no evidence that his defense had no reasonable or arguable basis. Accordingly, the trial court properly disregarded the jury's finding of bad faith and allowed appellee to recover his attorney's fees.

### Refusal to Require Reimbursement for Appellants' Attorney's Fees

■ In a separate issue, appellants claim the trial court should have required appellee to reimburse the Article IV Trust for appellants' attorney's fees and costs incurred in the prosecution of this case. Section 245 of the Probate Code provides:

When the personal representative of an estate or person neglects the performance of any duty required of him, and any costs are incurred thereby, or if he is removed for cause, he and the sureties on his bond shall be liable for costs of removal and other additional costs incurred that are not authorized expenditures, as defined by this code, and for reasonable attorney's fees incurred in removing him and in obtaining his compliance regarding any statutory duty he has neglected.

TEX. PROB.CODE ANN. § 245 (Vernon Supp. 2000). The courts have held that this statute allows the beneficiaries to recover the attorney's fees they incurred in removing an executor in recovering the effects of an executor's neglect of his statutory duties. *See Barnett v. Barnett*, 985 S.W.2d 520, 535 (Tex.App.—Houston [1st Dist.] 1998, writ granted); *Lawyers Sur. Corp. v. Larson*, 869 S.W.2d 649, 653 (Tex.App.—Austin 1994, writ denied).

■ Appellee argues that appellants are not entitled to recovery of fees under section 245 because they requested no finding by the jury or the trial court as to what amount of attorney's fees were incurred in obtaining appellee's compliance with any statutory duty he neglected or in removing him as executor. Case law has held that a party seeking recovery under section 245 must present evidence to enable the court to determine what fees are recoverable by the estate. *See Larson*, 869 S.W.2d at 652; *Fillion v. Osborne*, 585 S.W.2d 842, 845 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). The parties stipulated to reasonable and necessary attorney's fees and thus, no request for a finding by the jury or trial court was required.

■ Appellants respond that neither evidence nor segregation of fees was required. A party is not required to segregate fees unless the party asserts multiple claims, some of which entitle the party to recovery of fees and some of which do not. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex.1997). Appellants argue that, because all of their claims concerned alleged mismanagement of the estate and sought removal of appellee as executor and trustee, there were no claims for which appellants were not entitled to recovery of fees.

The statute allows the estate to recover attorney's fees expended for the following two actions: (1) removing the executor, and (2) compelling compliance with statutory duties. *See* TEX. PROP.CODE ANN. § 245 (Vernon Supp.2000). Statutory duties include: (1) giving notices required by statute; (2) approving, classifying, paying, or rejecting claims against the estate; and (3) delivering to those entitled exempt property and allowances for support. *See id.* at § 146. An executor is also charged with the duty to use reasonable care in that he must care for the property of the estate as a prudent man would take of his own property. *See id.* at § 230.

■ All of appellants claims for damages involved allegations of breach of fiduciary duty and, therefore, these were claims of violations of appellee's statutory duty of care. Appellants also sought appellee's removal as executor and as trustee. Although fees may not be recovered under section 245 for seeking removal of appellee as trustee, our review of the record shows that this effort and the facts supporting this claim were inextricably intertwined with the facts regarding removal as executor and for breaches of duty. There is an exception to the duty to segregate when the attorney's fees are rendered in connection with claims arising out of the same transaction and when the claims are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 11 (Tex. 1991). Because we find the prosecution of the claim to remove appellee as trustee was inextricably intertwined with the prosecution of appellants' other claims, we find this case falls within the recognized exception to segregation. Therefore, the trial court erred in refusing to apply section 245 to require appellee to reimburse the estate for the fees incurred by appellants.

On rehearing, both parties ask that we also rule with respect to appellate attorney's fees. In the judgment, the trial court awarded both parties $300,000 in fees for appeal to the court of appeals and $100,000 for seeking review in the Texas Supreme Court. These fees were to be paid by the Trustee for the Article IV trust. Appellants ask that we hold that appellee must also reimburse the Article IV trust for the awards of appellate attorney's fees to appellants.

As discussed above, section 245 of the Probate Code provides that an estate may recover reasonable attorney's fees incurred in removing the executor and in obtaining the executor's compliance regarding any statutory duty he neglected. TEX. PROB.CODE ANN. § 245 (Vernon Supp. 2000). Regarding appellate attorney's fees, appellee raises the same complaint he raised regarding trial court fees: Appellee claims that appellants did not segregate their fees between claims for which reimbursement is available under section 245 and claims for which reimbursement is not available. We have already held that segregation was not required because the claims were intertwined. This holding extends to appellate attorney's fees. Accordingly, we hold that, under section 245, appellee must reimburse the Article IV trust, and not appellants individually, for appellants' stipulated appellate attorney's fees.

Both parties agree that any award of attorney's fees should bear postjudgment interest at 10% per annum, compounded annually (a) from the date of judgment as to the stipulated $1.5 million in trial court attorney's fees, (b) from the date of this courts' judgment as to fees for appeal to this court, and (c) from the date of the supreme court's ruling on petition for review as to the award for fees on appeal to the supreme court.

## Exclusion of Evidence of Appellants' Damages Model

Appellants next challenge the trial court's exclusion of evidence of appellants' damage model that was designed to illustrate what a prudent executor would have done with the sale proceeds from the U.S. Home and Carothers contracts. Because we have held that the evidence regarding the unaccepted offers by U.S. Homes and Carothers was speculative and constituted no evidence of damages for breach of fiduciary duty to sell the properties, we need not address this issue.

## Refusal to Award Damages Directly to Susan Lee

██ Appellants contend that, because Susan Lee has a ⅙ beneficiary interest in the Article IV trust income, she was entitled to a recovery of ⅙ of the judgment damages representing trust income. In support of this argument, appellants cite Comment H to section 282 [9] of the Restatement of Trusts:

> ***Disposition of the Proceeds Recovered.*** Where the trust is of such a character that if the trustee had brought an action against the third person, the proceeds would be immediately payable to the beneficiary, the beneficiary is entitled to keep whatever he recovers from the third person under the rules stated in Subsection (2) and (3).

RESTATEMENT (SECOND) OF TRUSTS § 282 cmt. H (1959). Section 282, however, addresses when a beneficiary may maintain a suit against a third person. It does not concern suits by beneficiaries against the trustee. Accordingly, we do not find Comment H applicable.

Unless a trustee is under a duty to pay money immediately and unconditionally to the beneficiary, the beneficiary may only sue to compel the trustee to restore money to the trust. *See* RESTATEMENT (SECOND) OF TRUSTS § 198 & cmts. B–D (1959). Katherine Barnhart's will provided in Article IV that the trustee was to distribute equally to her children, and to the survivor between her children, "at least quarterly, one-third (⅓) of the current net income of the trust, and to the extent such income is insufficient for the following purpose shall distribute currently such amounts from the remaining two-thirds (⅔) of such current net income as may be necessary and re-

quired to provide for the health, maintenance and support of [her children, or the survivor], taking into consideration the availability of funds from other sources." Thus, Susan Lee was entitled to one-half of the one-third (one-sixth), of current net income.

The statutory definition of income is the return derived from the use of principal. *See* TEX. PROP.CODE ANN. § 113.102(a) (Vernon 1995). Examples of income are rent on real property and interest on money lent. *See id.* Section 113.102 instructs the trustee to charge expenses against income in accordance with section 113.111. *See* TEX. PROP.CODE ANN. § 113.102(c) (Vernon 1995). Section 113.111 requires the trustee to charge against income all ordinary expenses incurred in administration, management, or preservation of trust property, reasonable allowances for depreciation on improvements, and, unless the court directs otherwise, court costs and fees on periodic judicial accountings and other judicial proceedings concerning the income interest. *See* TEX. PROP.CODE ANN. § 113.111 (Vernon Supp.2000).

The will gives appellant, Susan Lee, an interest in "current net income," not gross income. Therefore, she was entitled to any Article IV trust income, minus expenses as described in section 113.111. She was not entitled to trust income before deduction of expenses. Accordingly, the trial court properly awarded the damages to the Article IV trust and not to Susan Lee directly.

## Prejudgment Interest

### 1. Simple or Compound Interest

██ Appellants next complain that the trial court awarded prejudgment interest

---

**9.** Appellants incorrectly cite to section 294, but 294 has no Comment H. Appellants apparently intended Comment H under section 282, which concerns suits in equity by beneficiaries.

at the rate of 10% per annum, computed as simple interest, when the award should be 10% per annum, compounded daily. Appellants contend that, because the claims in this case do not fall within any of the prejudgment interest statutes, the case is controlled by *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), which provides for interest compounded daily.

Although we agree with appellants that prejudgment interest in this case is not controlled by statute, the case on which appellants rely was overruled after appellants filed their brief. In *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex.1998), the supreme court held that prejudgment interest in cases controlled by common law is to accrue at the rate for postjudgment interest and it is computed as simple interest. Accordingly, the trial court properly computed the prejudgment interest in this case as simple interest.

## 2. Accrual Date for Calculation of Prejudgment interest

 In his first motion for rehearing, appellee claimed that prejudgment and postjudgment interest should be awarded on the $1.5 million in executor fees required to be reimbursed by appellee. Although appellee did not contest the imposition of prejudgment interest, he claimed that it should be awarded pursuant to *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998). The parties disagreed on the date from which prejudgment interest should accrue. Appellants also complained that appellee had not preserved this issue for review because he did not raise this complaint either in the trial court or in his brief in this court.

 We turn first to the preservation issue. A point of error not preserved is not before the appellate court for review. *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex.1987). An assignment of error raised for the first time in an appellant's motion for rehearing is too late to be considered. *Washington v. Walker County*, 708 S.W.2d 493, 497 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

The trial court awarded prejudgment interest, according to the law in existence at that time, which held that prejudgment interest began to accrue six months from the date of the occurrence giving rise to the cause of action. *Cavnar*, 696 S.W.2d at 555. The prejudgment interest at issue here, however, does not concern the prejudgment interest on the trial court awards we have upheld. Instead, the prejudgment interest at issue here concerns interest on the $1.5 million this court is rendering in favor of appellants. An award of prejudgment interest on this new award of damages is an automatic legal consequence since appellants pled for prejudgment interest. Neither the award of prejudgment interest, nor the accrual date of this interest, required a point of error for preservation. Because the date of this new award implicates case law that succeeds *Cavnar*, we must consider whether the *Cavnar* rule regarding accrual of prejudgment interest applies.

 "Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment'." *Id.* at 528 (quoting *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985)). The two legal sources for an award of prejudgment interest are general principles of equity, and an enabling statute. *See Kenneco*, 962 S.W.2d at 528. Statutory provisions for prejudgment interest apply only to cases involving claims

of wrongful death, personal injury, property damage, and condemnation. *See* TEX. FIN.CODE ANN. §§ 304.102, 304.201 (Vernon Supp.2000). Because the claims in this case do not fall within the statutory provisions, an award of prejudgment interest in this case is governed by the common law. *See Kenneco*, 962 S.W.2d at 530.

■■■ Appellants argue that prejudgment interest accrued from the dates Ronald Lee paid himself executor fees. Because Lee paid himself fees in a number of payments over a two-year period, appellants have provided a chart depicting the various payments and the amount of interest on each, with a total amount due of $2,051,311.79. Appellee disagrees with appellants' calculation and contends that appellants' argument is based on the approach described in the *Cavnar* case, in contravention to the more recent *Kenneco* case.

In *Kenneco*, the court held that, "under the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *See id.* at 531. A " 'claim' is 'a demand for compensation or an assertion of a right to be paid'." *See id.* Appellee contends the first date he received notice of a claim with regard to executor fees paid, was the date suit was filed. We have not located in the record an earlier date of notice of a claim with respect to the executor fees.

■■■ Appellants next argue that accrual of prejudgment interest under *Kenneco* would nullify appellee's duty of disclosure as a fiduciary. Appellants base this argument on the following premisses: (1) an executor owes a duty to disclose all material facts affecting the beneficiaries' rights, *see Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex.1996); and (2) courts have historically required breaching fiduciaries to pay prejudgment interest from the date the breaches occurred. *See, e.g., Ward v. Maryland Cas. Co.*, 140 Tex. 124, 166 S.W.2d 117, 119 (1942).

Despite the previous holdings that breaching fiduciaries must pay prejudgment interest from the date of breach, the *Kenneco* court held that the rule it announced applied to all cases that do not fall within the statutory guidelines for prejudgment interest. *See* 962 S.W.2d at 531. By making no exception for breach of fiduciary claims, the supreme court impliedly overruled all cases contrary to *Kenneco*. Therefore, we are not persuaded to create an exception to the *Kenneco* rule in cases involving breaching fiduciaries.

We hold that the date of accrual of prejudgment interest on the $1.5 million award rendered by this court is July 28, 1993, the date of filing of Plaintiffs' First Amended Petition. The prejudgment interest on those trial court damage awards upheld by this court accrues as the trial court ruled, according to *Cavnar*.

The *Kenneco* court further held that prejudgment interest accrues at the rate for postjudgment interest and it is to be computed as simple interest. *See id.* at 532. The rate of interest is 10%. *See* TEX. FIN.CODE ANN. § 304.003 (Vernon Supp. 2000).

Accordingly, we hold that appellants are entitled to prejudgment interest on the $1.5 million in excessive executor fees required to be reimbursed, at the rate of 10% per annum, computed as simple interest from the date of notice of the claim, July 28, 1993, to the day preceding entry of judgment, October 24, 1996. Appellants are entitled to postjudgment interest on this award calculated from the date of judgment, October 25, 1996.

### Conclusion

We find the trial court erred: (1) in deducting $1.5 million from the jury's finding of excessive fees; (2) in refusing to remove appellee as trustee; and (3) in refusing to require appellee to reimburse the estate for appellants' attorney's fees. Accordingly, we (1) reverse the portion of the judgment awarding the Article IV trust $659,506.50 and render judgment that the Article IV trust recover $1,538,848.50 in excessive executor fees, in addition to the $659,506.50 previously awarded by the trial court, for a total award of $2,198,355.00 in excessive executor fees; (2) reverse the portion of the judgment denying plaintiffs' request to remove Ronald Lee as the Trustee of the Article IV trust and we render judgment removing Ronald Lee as Trustee of the Article IV trust; and (3) we order the following: (a) that Ronald Lee reimburse the Article IV trust for appellants' stipulated $1.5 million in trial court attorney's fees; (b) that Ronald Lee reimburse the Article IV trust for the appellants' stipulated $300,000 in appellate attorney's fees; (c) that, in the event either party appeals to the Texas Supreme Court, Ronald Lee shall reimburse the Article IV trust for appellants' stipulated $100,000 attorney's fees; (d) that the Article IV trust, on behalf of appellants, recover from appellee prejudgment interest on the $1,538,848.50 in excessive executor's fee awarded by this judgment at the rate of 10% per annum, computed as simple interest, from the date of notice of the claim, July 28, 1993, through the date preceding the day of entry of judgment, October 24, 1996; (e) that the Article IV trust, on behalf of appellants, recover postjudgment interest at the rate of 10% per annum, compounded annually, on the total of (i) the excessive executor fees awarded by this court ($1,538,848.50), (ii) the excessive executor fees awarded by the trial court ($659,-506.50), and (iii) the prejudgment interest awarded on those amounts, from the date of the trial court's judgment, October 25, 1996; and (f) that appellee shall reimburse the Article IV trust for postjudgment interest at 10% per annum, compounded annually (i) from the date of the trial court's judgment as to appellants' $1.5 million in trial court attorney's fees, (ii) from the date of this court's judgment as to fees for appeal to this court, and (iii) from the date of the supreme court's ruling on petition for review as to the award for fees on appeal to the supreme court. We affirm the remainder of the judgment.