Affirmed and Memorandum Opinion filed September 16, 2004









Affirmed and Memorandum
Opinion filed September 16, 2004.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-02-00841-CV

_______________

 

REBEL DRILLING COMPANY, L.P., Appellant/Cross-Appellee

 

V.

 

NABORS DRILLING USA, INC.,
Appellee/Cross-Appellant

_______________________________________________________________

 

On Appeal from the 280th District Court

Harris County, Texas

Trial Court Cause No. 00-32699

_______________________________________________________________

 

M E M O R A N D U M   O
P I N I O N








Appellant, Rebel Drilling Company, L.P. (ARebel@), sued appellee, Nabors Drilling
USA, Inc. (ANabors@), for negligence in connection with
an oil well blowout.  Pursuant to the
jury=s verdict, the trial court rendered
judgment that Rebel take nothing.  In
five issues, Rebel contends (1) the trial court erred in excluding evidence,
(2) the trial court erred in submitting a non-party in the jury charge, (3) the
evidence is factually insufficient to support the verdict, (4) Nabors=s counsel made improper jury
argument, and in response, the trial court made improper comments, and (5) the
trial court erred in refusing to submit jury instructions on spoliation and res
ipsa loquitur.  Nabors presents a
cross-issue contending the trial court erred in denying its motion for directed
verdict.  Because all dispositive issues
are clearly settled in law, we issue this memorandum opinion and affirm.  Tex.
R. App. P. 47.4.

I. 
Background

This case arose from the blowout of the Bazor 13-1 well (Athe well@). 
Pursuant to a joint operating agreement, Rebel held a 33 a % non-operating interest in the
well, and Rand Paulson Oil Company (ARand@) was the operator with a 66 b % working interest.  Rand engaged Nabors to drill the well
pursuant to a daywork contract.[1]  Nabors designated its Rig 532 to drill the
well.








On the afternoon of June 30, 1998, Nabors was drilling in the
Smackover formation beneath the Little Creek Prospect in Wayne County,
Mississippi.  This formation is known to
have high pressure concentrations of hydrogen sulfideCa toxic gas.  While approaching target depth, George
Shirley, Nabors=s driller, recognized several indicators of a Akick.@[2] 
Therefore, he turned off the mud pumps and determined that the well
flowed with the pumps off, which confirmed a kick.  It is undisputed that the well should have
been immediately shut in by closing the blowout preventers (ABOPs@) when the kick was detected.[3]  However, A.J. Little, Rand=s Acompany man,@ had previously ordered Shirley not
to shut in the well if a kick occurred, but to summon him instead.[4]  Therefore, Shirley summoned Little, as well
as Paul Palmer, Nabors=s toolpusher on duty at that time.[5]  The parties vigorously dispute whether
Shirley should have disregarded Little=s order and immediately shut in the
well.  In any event, once Little arrived
on the rig floor, he ordered Shirley to turn the pumps back on.  Although Shirley Acouldn=t believe@ this order, he obeyed.  After reviewing the monitor, Little said the
flow was just saltwater.

However, approximately thirty minutes later, Little realized
a kick had occurred and shut in the well using the annular BOP.  Next, the crew tried to circulate the gas out
of the wellbore using the choke manifold.[6]  However, these attempts were unsuccessful
because the hydrogen choke was inoperable, and the fixed choke was
inappropriate for circulating out a hydrogen sulfide kick.  Meanwhile, the annular BOP failed and began
leaking gas.  Palmer then shut the upper
rams on the double BOP.  The crew took
other steps attempting to control the well. 
The crew pumped drilling mud in the hole to stabilize the pressure.  In addition, the crew tried to replace the
choke manifold.[7]








The upper rams held until evening when they failed causing a
violent eruption of wellbore product. 
Moments later, Eddie Goodman of Cudd Well Control shut the lower rams on
the single BOP using its hydraulic mechanism.[8]  He also tried to manually lock the lower rams
in case of hydraulic failure.  However,
he was unsuccessful because the hand wheels typically used to lock the rams
were missing,[9]
and the locking stems were corroded and could not be turned.  The lower rams held for ten or fifteen
minutes, and then they also failed. 
Fearing for the safety of the crew and area residents, Rand ignited the
gas plume. 

After emergency measures, the well was eventually
capped.  Rand subsequently filed
bankruptcy, and Rebel assumed operation of the well.  Rebel sued Nabors for negligence seeking to
recover its costs to control the well, redrill the well, restore the surrounding
area, and contain pollution, plus its lost production.  The jury found that Nabors=s negligence, if any, did not
proximately cause the blowout. 
Therefore, the trial court rendered judgment that Rebel take nothing.

II. 
Factual Sufficiency of the Evidence








In its third issue, Rebel contends the evidence is factually
insufficient to support the jury=s verdict.  We will address this issue first because the
circumstances surrounding the blowout are somewhat pertinent to Rebel=s other issues.  A party attacking factual sufficiency of the
evidence to support an adverse finding relative to an issue on which it had the
burden of proof must demonstrate on appeal that the adverse finding is against
the great weight and preponderance of the evidence.  Dow Chem. Co. v. Francis, 46 S.W.3d
237, 242 (Tex. 2001); Delaney v. Davis, 81 S.W.3d 445, 448 (Tex. App.CHouston [14th Dist.] 2002, no
pet.).  We must consider all of the
evidence and may set aside the verdict only if the evidence is so weak, or if
the finding is so against the great weight and preponderance of the evidence,
that it is clearly wrong and unjust.  Francis,
46 S.W.3d at 242; Delaney, 81 S.W.3d at 448.  The jury as trier of fact is the sole judge
of the credibility of the witnesses and the weight to be given to their
testimony.  Mayes v. Stewart, 11
S.W.3d 440, 451 (Tex. App.CHouston [14th Dist.] 2000, pet. denied); Mobilnet of S.
Tex. v. Pascouet, 61 S.W.3d 599, 615B16 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  We may not substitute our
judgment for that of the trier of fact, even if we would reach a different
answer on the evidence.  See Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998); Pascouet,
61 S.W.3d at 616.  The amount of evidence
necessary to affirm a judgment is far less than that necessary to reverse a
judgment.  Mayes, 11 S.W.3d at
451; Pascouet, 61 S.W.3d at 616.

Rebel contends the overwhelming weight of the evidence
established Nabors was negligent.  Most
significantly, Rebel asserts that Nabors failed to immediately shut in the well
when the kick was detected and failed to properly test the BOPs before the
blowout. According to Rebel, either of these measures could have prevented the
blowout.  Rebel also points to other
areas in which Nabors was allegedly negligent. 


In response, Nabors seems to agree it was not Aerror proof.@ 
However, Nabors contends its actions did not proximately cause the
blowout.  Without objection, the trial
court provided the following instruction on proximate cause to the jury: AThe injuries suffered by [Rebel] must
result from a chain of natural and unbroken sequence from the negligence, if
any, of [Nabors].@[10] 
According to Nabors, the blowout did not result from Aa chain of natural and unbroken
sequence@ from Nabors=s actions.  Specifically, Nabors contends Rand=s personnel precluded Nabors from
immediately shutting in the well and Nabors could not countermand that
order.  Nabors also contends that Rand
was fully responsible for testing the BOPs.








After considering all the evidence, we conclude the evidence
is factually sufficient to support the jury=s finding that Nabors=s negligence, if any, did not
proximately cause the blowout.  We will
first address the key areas pertinent to the blowoutCfailure to immediately shut in the
well and failure to test the BOPs.  We
will then address other areas in which Nabors was allegedly negligent.[11]

A.        Failure
To Immediately Shut In The Well

Rebel contends that Nabors was negligent for failing to
immediately shut in the well when the kick was detected.[12]  It is undisputed that the well should have
been immediately shut in, and shutting in the well could have prevented the
blowout.[13]  However, Little ordered Nabors not to shut in
the well.  Thus, the parties dispute
whether Nabors should have shut in the well despite Little=s order.

Rebel cites the daywork contract which provided that Nabors Ashall use all reasonable means to
prevent and control fires and blowouts and to protect the hole.@ 
However, the daywork contract also provided that the drilling operation
was under Rand=s Adirection, supervision and control,@ and Rand assumed all risks and
liabilities resulting from the drilling operation (emphasis added).  








At trial, Carlton Campbell, Nabors=s district manager over Rig 532,
confirmed that under a daywork contract, Nabors assigns all control of the well
and drilling operation to the operator.[14]  Specifically, between the company man and
driller, it is the company man=s decision whether to shut in the well.  Campbell would expect the driller to act as
ordered because it is Athe operator=s well.@[15]

According to Nabors, Rand=s contractual assumption of liabilities
under the daywork contract would likely have been waived if Nabors had Amutinied@ and countermanded Little=s order.  Gene Beck, Nabors=s vice president and Atop dog@ with respect to blowouts, testified
he would be Aterrified@ of the contractual consequences if
the driller took over well control operations on his own; Nabors would assume
risks and liabilities it had not assumed under the daywork contract.  Shirley, Nabors=s driller, echoed that there was Ano telling@ what the consequences would have
been if he had disregarded Little=s order and shut in the well; Nabors
would have been Acompletely responsible@ for the well.[16]








Despite these contractual concerns, Rebel asserts that Nabors=s employees should not have followed
the unsafe orders of an incompetent company man.[17]  However, Beck explained that Nabors protested
to a great extent and hoped its concerns would be addressed, but the well blew
out before the concerns were addressed.[18]  Rebel also notes that Neal Adams, Nabors=s expert, testified in his deposition
that a reasonably prudent driller would not follow the order of a blatantly
incompetent company man.  However, at
trial, Adams opined that a driller should countermand a company man=s order only when the order is Abizarre or crazy.@ 
Adams opined that under the circumstances at the time of this kick,
Shirley should not have countermanded Little=s order.

In addition, Rebel asserts that Nabors=s own policies allowed its employees
to countermand Little=s order.  In
particular, Nabors=s Health, Safety, and Environmental Procedures Manual
instructs that employees Ashall have authority to cease any operation that poses an
immediate serious threat of injury.@[19] 
Shirley and Palmer gave somewhat conflicting testimony regarding Nabors=s policies.  On one hand, they both testified that Little
controlled whether to shut in the well even if his decision was contrary to
their training.  On the other hand, they
both suggested they had authority to shut in the well despite Little=s order, but Nabors would not
necessarily back them up if they exercised that authority.








Beck also gave somewhat conflicting testimony regarding
Nabors=s policies.  At one point, he testified that at the time
of the blowout, Nabors=s employees had authority to cease unsafe operations, but
that authority had not been clearly expressed in Nabors=s drilling policy.  At another point, Beck testified that at the
time of the blowout, Nabors Adid not have the attitude@ that its employees could Astep in and take control of the well.@ 
Regardless of the conflicting testimony regarding Nabors=s policies, Campbell explained that
under a daywork contract, Nabors walked a Athin line@ between following its own policies
and acting under the operator=s direction.

In 1999, Nabors rewrote its drilling policy and clearly expressed
its employees= authority to shut in a well despite
a company man=s contrary order.  Under the new policy, A[t]he Driller is responsible for, and
authorized to, shut in the well on his own recognition.  The Toolpusher is the only person authorized
to open the well.@  Rebel contends Nabors
could have had this policy in place at the time of the blowout.  However, Nabors=s management explained that Nabors
had not yet recognized the need at that time, and the policy was developed in
direct response to this blowout.[20]


Finally, Rebel claims that Nabors knew it could countermand
unsafe orders of a company man based on previous Nabors=s blowouts.  For example, concerning the blowout of Nabors=s Rig 745 well, Wild Well Control,
Inc. reported that per the company man=s instruction, the well was not shut
in when it began flowing.[21]  Wild Well Control opined that Athe driller and toolpusher should have
shut-in the well . . . and superceded the Company man=s decision to pump into the well.@ 
When asked if he agreed with this opinion, Beck responded, AYes and No.@ 
He explained that under a daywork contract, the company man has superior
knowledge of Awhat=s happening@ in the subsurface, and his decision
not to shut in a well could be correct.[22]








In sum, the evidence was conflicting on whether Nabors should
have shut in the well despite Little=s contrary order.  As fact finder, the jury was free to resolve
this dispute in Nabors=s favor.  See Mayes,
11 S.W.3d at 451; Pascouet, 61 S.W.3d at 615B16. 
There was sufficient evidence from which the jury could conclude that
Rand precluded Nabors from immediately shutting in the well, and Nabors could
not countermand that order.[23]

B.        Failure
To Properly Pressure Test The BOPs

Rebel also contends that Nabors was negligent for failing to
properly pressure test the BOPs.  Nine
days before the blowout, the rams on the BOPs were changed.  During this process, their bonnet seals were
changed, compromising the integrity of the BOPs.  It is undisputed the BOPs should have been
tested to their rated working pressuresC10,000 psiCbefore drilling continued.[24]  However, the BOPs were only tested to 2,500
psi.  Mike Wilson, Nabors=s toolpusher on duty at that time,
urged Little to test the BOPs to 10,000 psi, but Little refused.  The parties dispute whether Nabors should
have ensured the BOPs were properly tested despite Little=s refusal.








Rebel cites the daywork contract which provides, A[Nabors] shall maintain well control
equipment in good condition at all times . . . .@ 
However, Campbell and Beck testified that under a day work contract, the
operator bears full responsibility for pressure testing BOPs.  Consequently, Nabors had no commensurate
obligation.  Campbell further explained
that maintenance is different than testing; Nabors maintains the equipment to
whatever standard the operator requires Ato get his test.@[25]

Regardless, Larry Kuhlman, Rebel=s expert, testified Nabors was not
relieved of responsibility to test the BOPs. 
Kuhlman stated that it is standard practice for a driller to ensure that
well control equipment is tested because the driller owns most of the equipment
and can best identify problems.  Kuhlman
also opined that a reasonably prudent driller, if unable to resolve the
conflict over testing with the company man, would have stopped drilling and
sought intervention from Nabors=s management.

Wilson did report Little=s actions to Nabors=s off-site rig superintendent.  The evidence is unclear to what extent Nabors
intervened to enforce testing of the BOPs. 
According to Kuhlman, Nabors Apassively let it go,@ and Wilson never received any
support from Nabors.  However, Beck was Avery certain@ that Wilson=s superintendent protested to Rand.[26]  In any event, Nabors placed the blame for
failing to test the BOPs solely on Rand. 
Adams, Nabors=s expert, opined that it would not have been reasonable for
Nabors to test the BOPs if Rand ordered it not to. 

Under Nabors=s new drilling policy, its employees are required to test
BOPs every fourteen days if the operator does not fulfill its responsibility to
do so.  Again, Rebel suggests Nabors
could have had this policy in place at the time of the blowout.  However, as we previously discussed, Nabors=s management testified the new policy
was developed in direct response to this blowout.  Additionally, Nabors did not acknowledge the
need to implement a BOP testing policy in 1998.








In sum, the evidence was conflicting on whether Nabors should
have properly tested the BOPs despite Little=s failure to do so.  As fact finder, the jury was free to resolve
this dispute in Nabors=s favor.  See Mayes,
11 S.W.3d at 451; Pascouet, 61 S.W.3d at 615B16. 
There was sufficient evidence from which the jury could conclude that
Rand was fully responsibility for testing the BOPs.

C.        Other
Negligence Allegations

Rebel also contends Nabors was negligent for providing an
inappropriate choke and failing to maintain the manual locking device for the
rams.

1.         Inappropriate Choke

Rebel asserts that Nabors provided an inappropriate backup
choke because it provided a Afixed@ choke instead of an Aadjustable@ choke.[27]  It is undisputed that the backup choke should
have been an adjustable choke.  However,
Nabors presented evidence that Rand was responsible for failure of the choke
manifold to circulate gas out of the well. 


Beck testified that the operator has an inherent right and
responsibility to install the equipment it deems necessary, inspect Nabors=s equipment to ensure it is fit for
its purpose, and demand corrections to equipment that does not meet the
operator=s specifications.  Specifically, the operator has the right to
replace a back up choke with any type of choke it wants.  According to Beck, it is generally assumed
that if the operator does not object to a piece of equipment provided by
Nabors, the operator accepts it as suitable.








Further, the hydraulic choke rented by Rand was inoperable on
the day of the blowout.  The hydraulic
choke had failed a test twenty days before the blowout, but Little refused to
replace it.  Nevertheless, Kuhlman, Rebel=s expert, testified that Nabors was
obliged to maintain all well control equipment including equipment rented by
Rand.  In contrast, Campbell testified
that under a daywork contract, the operator is responsible for maintaining,
testing, and if necessary, replacing the hydraulic choke.  Despite Rand=s failure to shut in the well, Palmer
testified that the crew probably could have circulated the gas out of the well
if the hydraulic choke had been working. 


In addition, on the day of the blowout, Rand attempted to
replace the entire choke manifold instead of just replacing the defective
hydraulic choke although a replacement hydraulic choke was available.  Palmer explained that it is quicker to
replace a hydraulic choke than an entire choke manifold.  According to Adams, Nabors=s expert, gas continued migrating
toward the surface while the crew attempted to replace the choke manifold.  However, replacing the hydraulic choke would
have allowed the crew to circulate the gas out of the well.

In sum, there was sufficient evidence from which the jury
could conclude that Rand was responsible for failure of the choke
manifold.  Further, as we have discussed,
there is sufficient evidence that Rand could have prevented the blowout by
timely and properly testing the BOPs or timely shutting in the well before
operation of the choke manifold became a significant factor.[28]

2.         Manual
Locking Device








Rebel also contends Nabors was negligent for failing to
maintain the manual locking device for the rams.  It is generally undisputed that hand wheels
should have been available, and locking stems should have been in good
condition when Eddie Goodman attempted to manually lock the lower pipe rams on
the evening of the blowout.  However,
Nabors placed some blame on Rand for the condition of the locking device.  Again, Beck testified that the operator has
the right and responsibility to ensure that equipment is fit for its purpose.  Beck was surprised that Little did not object
to the condition of the locking stems. 
Nevertheless, there is sufficient evidence that Rand could have
prevented the blowout by timely and properly testing the BOPs or timely
shutting in the well long before a manual locking device would have been
required.

In sum, Nabors presented ample evidence that the blowout did
not result from Aa chain of natural and unbroken sequence@ from Nabors=s actions or inactions.  Accordingly, the jury=s finding that Nabors=s negligence, if any, did not
proximately cause the blowout is not so weak, or so against the great weight
and preponderance of the evidence, that it is clearly wrong and unjust.  Rebel=s third issue is overruled.

III. 
Exclusion of Evidence

In its first issue, Rebel contends the trial court erred in
excluding a blowout report prepared by Wild Well Control at Nabors=s request.  The report recites information regarding the
blowout and Wild Well Control=s opinions regarding the cause of the blowout.  Nabors objected that the report is hearsay,
contains hearsay within hearsay, and there is no foundation for the expert=s opinions.  The trial court excluded the report without
stating the reason for its ruling.

We review a trial court=s exclusion of evidence for abuse of
discretion.  Owens‑Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998); City of
Brownsville v. Alvarado, 897 S.W.2d 750, 753B54 (Tex. 1995).  A trial court abuses its discretion when it
acts without regard for any guiding principles. 
Malone, 972 S.W.2d at 43; Alvarado, 897 S.W.2d at 754.








On appeal, Rebel argues that the report itself was not
hearsay because it was an admission by a party opponent.  See Tex.
R. Evid. 801(e)(2). 
Alternatively, Rebel argues the report was not excluded by the hearsay
rule because it was a business record.  See Tex.
R. Evid. 803(6).  However, Rebel
has not addressed Nabors=s other objectionsCthat the report contains hearsay
within hearsay and no foundation was laid for the expert=s opinions.  We must uphold the trial court=s evidentiary ruling if there is any
legitimate basis for the ruling.  Malone,
972 S.W.2d at 43.

A.        Hearsay
Within Hearsay 

The author of the blowout report stated, AIn our review of the records, it was
determined that . . . @  The author then
recites details of the blowout based on Athe records.@ 
In fact, Wild Well Control=s custodian of records testified by
deposition on written questions that Wild Well Control did not contribute any
information to the report.  Therefore,
the report contains hearsay within hearsay. 
Hearsay within hearsay is admissible only if each part of the combined
statements fits within an exception to the hearsay rule.  Tex.
R. Evid. 805; First Southwest Lloyds Ins. Co. v. MacDowell, 769
S.W.2d 954, 959 (Tex. App.CTexarkana 1989, writ denied). 
However, Rebel did not prove an exception that would render the hearsay
within hearsay admissible.  See
Fibreboard Corp. v. Pool, 813 S.W.2d 658, 676 (Tex. App.CTexarkana 1991, writ denied) (citing Skillern
& Sons, Inc. v. Rosen, 359 S.W.2d 298, 301 (Tex. 1962) and recognizing
proponent of hearsay has burden to prove an exception to the general rule
against hearsay); see also Roberts v. Allison, 836 S.W.2d 185, 191 (Tex.
App.CTyler 
1992, writ denied).  Accordingly,
the trial court did not abuse its discretion by excluding the hearsay within
hearsay in the report.  See MacDowell,
769 S.W.2d at 959 (holding trial court properly excluded fire marshal=s report because it contained another
witness=s account of the fire that did not
fit within a hearsay exception).

B.        Expert
Opinions








After reciting details of the blowout, the author of the
report renders opinions regarding the cause of the blowout.  A party offering expert opinions must
establish that the expert is qualified by Aknowledge, skill, experience,
training, or education@ to give an opinion on the particular subject.  See Tex.
R. Evid. 702; Broders v. Heise, 924 S.W.2d 148, 151B52 (Tex. 1996); see also ITT
Commercial Fin. Corp. v. Riehn, 796 S.W.2d 248, 250 (Tex. App.CDallas 1990, no writ) (stating party
offering expert=s opinion must establish expert possesses a higher degree of
knowledge than ordinary person or trier of fact).  However, Rebel did not call the author of the
report to testify or otherwise prove that the author was qualified to render
the opinions.  Accordingly, the trial
court did not abuse its discretion by excluding the expert opinions in the
report.  Rebel=s first issue is overruled.

IV. 
Jury Charge

In its second issue, Rebel contends the trial court erred in
submitting Rand in the jury charge. 
Specifically, the jury answered Question One in the charge as follows:

Did
the negligence, if any, of those named below proximately cause the occurrence
in question:

Answer AYes@ or ANo@ for each of the following:

a.         Nabors
Drilling U.S.A., Inc.    No    

b.         Rand Paulson
Oil Company Inc.         Yes   








Rebel contends submission of Rand was error because Rand was not a
claimant, defendant, settling person, or properly joined Aresponsible third party.@ 
See Acts 1987, 70th Leg., 1st C.S., ch. 2, ' 2.06, eff. Sept. 2, 1987; Amended by
Acts 1995, 74th Leg., ch. 136, ' 1, eff. Sept. 1, 1995 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. ' 33.003 (Vernon Supp. 2004B2005 )).  However, any error in submitting Rand was
harmless.[29]


            Error in the jury charge
is reversible only if considering the record as a whole, including the
pleadings, the evidence presented at trial, and the charge in its entirety, the
error probably caused rendition of an improper verdict.  See Tex. R. App. P. 44.1; Island
Recreational Dev. Corp. v. Republic of Texas Sav. Ass=n, 710 S.W.2d 551, 555 (Tex. 1986); Wal‑Mart
Stores, Inc. v. Redding, 56 S.W.3d 141, 149 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  Submission of an improper jury
question can be harmless error if the jury=s answers to other questions render
the improper question immaterial.  Alvarado,
897 S.W.2d at 752.  A jury question is
considered immaterial when its answer can be found elsewhere in the verdict or
when its answer cannot alter the effect of the verdict.  Id. 
Submission of an immaterial issue is not harmful error unless the
submission confused or misled the jury.  Id.  When determining whether a particular
question could have confused or misled the jury, we Aconsider its probable effect on the
minds of the jury in the light of the charge as a whole.@ 
Id.

Here, the jury=s finding with respect to Nabors
rendered submission of Rand immaterial. 
Once the jury found that Nabors=s negligence, if any, did not
proximately cause the blowout, its finding that Rand=s negligence proximately caused the
blowout could not have altered the effect of the verdict.  See Alvarado, 897 S.W.2d at 751B52 (holding that any error in
submitting claimants= deceased, in addition to defendant, in jury charge was
harmless; once jury found defendant was not negligent, its finding that
deceased was negligent could not have altered the effect of the verdict).








Nevertheless, Rebel contends the improper jury question was
not immaterial to the verdict because Nabors and Rand were submitted in the
same question; thus, the improper question was the verdict.  However, for purposes of our harm analysis,
we find no significance in the trial court=s submitting Rand after Nabors in the
same question, as opposed to submitting Rand in a consecutive question.  The jury=s finding with respect to Nabors
would render submission of Rand immaterial in either situation.  See Munden v. Reed, No. 05-01-01896-CV,
2003 WL 57751, at *1B2 (Tex. App.CDallas 2003, no pet.) (not designated for publication)
(holding that any error in submitting non-party in same jury question as
defendant was harmless; jury=s finding that defendant was not negligent rendered
submission of non-party immaterial).

Consequently, the error was harmless unless it confused or
misled the jury.  See Alvarado,
897 S.W.2d at 752.  Considering the
charge as a whole, the inclusion of Rand could not have misled or confused the
jury.  The jury was instructed that there
could be more than one proximate cause of an occurrence.  Negligence and proximate cause were defined
separately for Nabors and Rand.  The jury
was instructed to allocate percentages of responsibility only if it found both
parties negligent.  Therefore, the jury
was not misled to believe it had to choose between Nabors and Rand in assessing
liability.

Finally, the record as a whole demonstrates that submission
of Rand did not cause rendition of an improper verdict.  Throughout the trial, Nabors pointed to Rand=s actions as the cause of the
blowout.  Therefore, we cannot say that
the mere presence of Rand in the jury question caused the jury to find no
liability on Nabors=s part.  Accordingly,
submission of Rand in the negligence question was not reversible error.  Rebel=s second issue is overruled.

V. 
Jury Argument and Trial Court=s
Comments  

In its fourth issue, Rebel contends Nabors=s counsel made improper jury
argument, and in response, the trial court made improper comments.

A.        Jury
Argument








During trial, Rebel=s and Nabors=s experts gave conflicting testimony
on the value of Rebel=s lost production claim. 
Before closing arguments, the trial court determined that Rebel could
only recover one-third of its lost production correlated with its percentage of
ownership in the well.  Apparently, there
was some misunderstanding on what figure would constitute one-third if the jury
were to accept the lost production calculations by Rebel=s expert.  In his closing argument, Rebel=s attorney stated the figure would be
$437,486.08, prompting Nabors=s attorney to subsequently argue:

until I heard [Rebel=s
counsel] . . . put this number up here . . . this is symptomatic of what you=ve been hearing for . . . seven and a half days.  The number that was put up by [Rebel=s expert] . . . was $946,807, and that was using
January, February and March, the highest prices that they=d ever seen in the industry before or since then.  One-third of this number is $315,600.  That=s the
kind of smoking [sic] mirrors that basicallyC 

The court then interrupted the argument and held a discussion with the
attorneys off the record.

In particular, Rebel complains of Nabors=s suggestion that Rebel and its
counsel subjected the jury to Asmoke and mirrors@ throughout the entire trial.  However, even if Nabors=s argument was improper, Rebel failed
to object.  Rebel contends no objection
was required because the argument was incurable.  See Otis Elevator Co. v. Wood, 436
S.W.2d 324, 333 (Tex. 1968) (holding party must object to preserve error if
improper argument is curable, but not if argument is incurable); see also
Gannett Outdoor Co. of Texas v. Kubeczka, 710 S.W.2d 79, 87 (Tex. App.CHouston [14th Dist.] 1986, no
writ).  We disagree. 

Incurable argument occurs when it is so inflammatory that its
harmful or acutely prejudicial nature cannot be cured by an instruction to
disregard.  Otis Elevator Co., 436
S.W.2d at 333; Gannett Outdoor Co., 710 S.W.2d at 86.  The test is whether a juror of ordinary
intelligence would have been persuaded to render a contrary verdict but for the
improper argument.  See Gannett
Outdoor Co., 710 S.W.2d at 86B87; see also Beavers v. Northrop
Worldwide Aircraft Servs., Inc., 821 S.W.2d 669, 680 (Tex. App.CAmarillo 1991, writ denied).








Nabors=s argument was not so inflammatory or acutely prejudicial
that it could not have been cured by an instruction to disregard.  See Gannett Outdoor Co., 710 S.W.2d at
86 (holding counsel=s argument generally belittling opposing party, its counsel,
and witnesses by telling jury the party had lied to them and been unfair was
curable).  Moreover, the jury heard
extensive evidence regarding the blowout. 
Therefore, it is our considered opinion that Nabors=s isolated reference to Asmoke and mirrors@ was not so inflammatory or
persuasive that the jury would have otherwise rendered a different
verdict.  See Beavers, 821 S.W.2d
at 680 (finding defense counsel=s argument that the Alawsuit world@ consists of Atwisting, turning, exaggerating,
repeating over and over, misstatements of facts, until the hope is that some
people of twelve will accept those as true facts@ could not have persuaded jury to
reach verdict it would not have otherwise reached).  Accordingly, the argument was curable, and
Rebel waived its complaint by failing to object.

B.        Trial
Court=s Comments

Rebel also complains of the trial court=s comments in response to Nabors=s argument. After the discussion off
the record, the trial court immediately explained to the jury:

there=s a confusion about the B the two
different numbers you=ve seen out on the board and I think it=s my fault because of the instructions I gave the
parties last night.  As a result of the
instructions that I gave [Rebel], they thought I meant the
400-something-thousand-dollar figure.  I
believe that the instructions I should have given would have resulted in the
300-something-thousand-dollar figure . . . but the idea is that you are to
consider the damages, if any, as though [Rebel] is entitled to one-third of
whatever the total damages are with regard to the lost production . . . we were
having a difficulty with what one third is. 
I believe that the one-third that you should consider is the $300,000
figure but that doesn=t mean I=m
telling you to award that much or to award no more than that.  What I=m
telling you is that according to the instructions I gave them about figuring
what a third would be of what [Rebel=s
expert] testified to, this would be the appropriate instruction and now it=s up to you to decide whether that is the correct
figure or not as far as what the total damages would be.








Rebel contends these comments worsened the effect of Nabors=s argument.  We disagree. 
The trial court informed the jury that any misunderstanding was the
trial court=s faultCnot Rebel=s. 
Therefore, the trial court corrected Nabors=s suggestion that Rebel=s counsel was improperly inflating
Rebel=s damages.

Rebel also contends the trial court=s statements constituted improper
comments on the weight of the evidence. 
We disagree.  A trial court
impermissibly comments on the weight of the evidence if it indicates the court=s opinion concerning a matter to be
determined by the jury.  See In re
M.E.C., 66 S.W.3d 449, 458 (Tex. App.CWaco 2001, no. pet.).  Here, the trial court made clear it was not
advocating that the jury award a certain amount of damages.  Rather, the court clarified what one-third of
Rebel=s lost production claim would be if
the jury accepted the figure provided by Rebel=s expert.  In any event, the trial court=s comments were harmless because they
concerned Rebel=s damages, and the jury never reached the issue of
damages.  Accordingly, Rebel=s fourth issue is overruled.

VI. 
Requested Jury Instructions

In its fifth issue, Rebel contends the trial court erred by
refusing to submit its requested jury instructions on spoliation of evidence
and res ipsa loquitur.[30]  We review a trial court=s refusal to submit a particular jury
instruction for abuse of discretion.  In
re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000); Lee v. Lee, 47 S.W.3d
767, 789 (Tex. App.CHouston [14th Dist.] 2001, pet. denied).  The trial court must submit requested jury
instructions if the pleadings and any evidence support them.  See Tex.
R. Civ. P. 278; Lee, 47 S.W.3d at 789 (citing Elbaor v. Smith,
845 S.W.2d 240, 243 (Tex. 1992)).








A.        Spoliation of Evidence

First, Rebel complains that the trial court refused to submit
a jury instruction on spoliation of evidence. 
Generally, two presumptions derive from the non-production of evidence:
(1) intentional spoliation of relevant evidence raises a presumption that the
evidence would have been unfavorable to the spoliator; and (2) failure to
produce relevant evidence within a party=s control, or explain its
non-production, raises a rebuttable presumption that the missing evidence would
be unfavorable to the nonproducing party. 
See Wal‑Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 721B22 (Tex. 2003); Brumfield v. Exxon
Corp., 63 S.W.3d 912, 920 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied).  Rebel claims that Nabors
spoliated evidence in two instances: (1) Nabors failed to produce records
concerning the purchase, storage, maintenance, and repair of the BOPs at issue;
and (2) Nabors=s expert, Neal Adams, intentionally
destroyed his notes.

1.         BOP Records

Rebel first claims that Nabors failed to produce any records
concerning the purchase, storage, maintenance, and repair of the BOPs at issue
although it had a duty to preserve such records.  Rebel also asserts that Nabors was unable to
prove that these records were destroyed in the ordinary course of business
through a document destruction policy. 
However, Rebel does not cite any evidence showing that any such records
existed, much less that Nabors destroyed, or failed to produce, them.  








To the contrary, there was credible evidence negating the
existence of such records. Carlton Campbell testified that Nabors acquired Rig
532 when it purchased a company named Cheswick Pruett.  Campbell believed that Rig 532 was at a
Cameron shop for refurbishment and testing when Nabors purchased Cheswick
Pruett.[31]  Campbell acknowledged that the American
Petroleum Institute recommends Aa maintenance and repair historical file@ be maintained on all BOP
equipment.  However, Nabors and Cameron
were unable to find a maintenance file on Rig 532 or its BOP equipment.  Therefore, at most, Rebel demonstrated that
Nabors should have maintained a maintenance and repair file on the BOPs or
obtained such a file, if any, from Cheswick Pruett when it purchased Rig
532.  However, Rebel cites no evidence
that Nabors destroyed or failed to produce any existing files.  Accordingly, the trial court did not abuse
its discretion by refusing to submit an instruction on spoliation of BOP
records.  See Anderson v. Taylor Publ=g Co., 13 S.W.3d 56, 61 (Tex. App.CDallas 2000, pet. denied) (holding
discrimination plaintiff was not entitled to spoliation presumption based on
employer=s failure to produce Atermination lists;@ plaintiff presented no evidence
employer intentionally destroyed or suppressed the lists, and other employees
testified they no longer possessed any such lists).

2.         Neal Adams=s Notes

Next, Rebel claims that Adams intentionally destroyed his
notes precluding Rebel from fully discovering and cross-examining the
methodologies, facts, and data underlying his opinions.  Some extensive hand-written notes, purportedly
belonging to Adams, are included in the record. 
A few of the notes are redacted with a black marker.  However, the notes were not admitted into
evidence.  Further, during cross-examination,
Rebel did not ask Adams about the notes to determine who redacted them, what
was redacted, or why they were redacted. 
Therefore, Rebel did not prove that the notes belonged to Adams, much
less that he intentionally destroyed them. 
Accordingly, the trial court did not abuse its discretion by refusing to
submit a spoliation instruction regarding the notes.  See Dunn v. Bank‑Tec South, 134
S.W.3d 315, 326B27 (Tex. App.CAmarillo 2003, no pet.) (finding plaintiffs were not entitled
to spoliation instruction on loss of defendant=s videotape depicting accident; trial
court could not reasonably infer its destruction was intentional because
plaintiffs did not cite, and court did not find, any evidence indicating who
destroyed or lost it or the circumstances surrounding its destruction or loss).








B.        Res
Ipsa Loquitur

Rebel also complains that the trial court erred in refusing
to submit a jury instruction on res ipsa loquitur.  Res ipsa is a rule of evidence through
which a jury may infer negligence solely from the surrounding circumstances. See
Haddock v. Arnspiger, 793 S.W.2d 948, 950 (Tex. 1990).  Res ipsa is applicable only when two
factors are present: (1) the character of the accident is such that it would
not ordinarily occur in the absence of negligence; and (2) the instrumentality
causing the injury is shown to have been under the management and control of
the defendant. Id.

With respect to the first factor, the party requesting a res
ipsa instruction must produce evidence that the accident was the type
usually associated with negligence.  See
Marathon Oil Co. v. Sterner, 632 S.W.2d 571, 573 (Tex. 1982).  Generally, res ipsa is not applicable
where (1) the plaintiff cannot rely on general knowledge to show the accident
would not have happened in the absence of negligence, and (2) the plaintiff has
not produced expert testimony that the accident ordinarily does not occur
without negligence.  Trans Am.
Holding, Inc. v. Market‑Antiques and Home Furnishings, Inc., 39
S.W.3d 640, 649 (Tex. App.CHouston [1st Dist.] 2000, pet. denied).

The occurrence of blowouts, in the absence of negligence, is
not a matter of general knowledge.  To
the contrary, the evidence shows that drilling an oil well involves certain
risks, particularly when drilling in formations with high pressure concentrations
of hydrogen sulfide.  Further, the evidence
shows that a blowout begins with a natural phenomenonCa kickCwhen gas spontaneously enters the
wellbore.








In addition, Rebel does not cite any expert testimony that
blowouts do not occur in the absence of negligence.  Rebel contends failure of the BOPs at
pressure below their capacities because of bonnet seal defect sufficiently
demonstrates the character of this blowout was such that it would not
ordinarily occur in the absence of negligence. 
As previously discussed, it is disputed whether a BOP failure caused the
blowout.  However, even assuming that a
BOP failure caused the blowout, Rebel does not cite any expert testimony that
BOPs do not ordinarily fail in the absence of negligence.  See Soto v. Texas Indus. Inc., 820
S.W.2d 217, 220 (Tex. App.CFort Worth 1991, no writ) (holding trial court did not abuse
its discretion in denying a res ipsa instruction when plaintiffs
presented no expert knowledge that concrete walls do not ordinarily fall in the
absence of negligence, and general knowledge could not support the contention).

Finally, res ipsa is not appropriate when direct
evidence points to possible negligence.  See
Trans Am. Holding, 39 S.W.3d at 649B50; see also Farr v. Wright,
833 S.W.2d 597, 600B01 (Tex. App.CCorpus Christi 1992, writ denied) (determining that res
ipsa, Awhich concerns cases involving only
weak circumstantial evidence,@ was inapplicable when both circumstantial and direct
evidence pointed to a specific act of negligence).  Rebel has consistently claimed that specific
acts of negligence on Nabors=s part caused the blowout. 
Rebel did not establish that the nature of the blowout Awas such that, taken apart from
[Nabors=s] alleged acts, negligence may be
inferred.@ 
See Trans Am. Holding, 39 S.W.3d at 650.  Accordingly, because Rebel has not satisfied
the first res ipsa factor, the trial court did not abuse its discretion
in refusing to submit a res ipsa instruction.  Rebel=s fifth issue is overruled.

The trial
court=s judgment is affirmed.[32]

 

/s/        Charles W. Seymore

Justice

 

Judgment rendered
and Memorandum Opinion filed September 16, 2004.

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.

 











[1]  Under a
daywork contract, the driller supplies the equipment and personnel to drill the
well and charges the operator a fixed rate per day.  However, the operator retains control of the
drilling operation and assumes all risks and liabilities.





[2]  A kick occurs
when gas enters the wellbore and starts toward the surface.  A kick can result in a blowout and is an
imminent threat to the rig and crew if not handled correctly.





[3] A BOP controls a well by holding gas below the
surface up to a certain pressure.  A BOP
typically uses Arams,@ which are operated hydraulically, to seal the
well.  When shut, Apipe rams@ seal
the well by fitting around the drillpipe. 
In contrast, Ablind rams@ seal
the well when no pipe is inside the wellbore. 
An annular BOP is a different type BOP that completely shuts off the
wellbore.  Pursuant to the daywork
contract, Nabors provided a ABOP stack@
consisting of the following: a single, 10,000 psi BOP with a set of pipe rams (Athe lower rams@); a
double, 10,000 psi BOP with a set of pipe rams (Athe
upper rams@) and a set of blind rams; and a 5,000 psi annular
BOP. 





[4]  Under a
daywork contract, the Acompany man@ is the
operator=s on-site representative with control over the well
and drilling operation.





[5]  The toolpusher
was Nabors=s senior employee on the rig.





[6]  A choke
manifold is another piece of well control equipment that circulates gas from
the well when the BOPs are closed.  A
choke manifold consists of chokes connected to the BOP stack through valves,
fittings, and lines.  Pursuant to the
daywork contract, Nabors provided a 10,000 psi choke manifold.  The choke manifold consisted of a hydraulic
choke rented by Rand and a back-up Afixed@ choke provided by Nabors.





[7]  However, the
choke manifold was not replaced by the time of the blowout because the crew had
difficulties removing the old one, and several hours of work lay ahead to
install the new one.





[8]  Rand had
called Cudd Well Control for assistance, and Goodman arrived in the evening. 





[9]  Goodman tried
to use a wrench and piece of steel in place of the hand wheels.





[10]  We review the
sufficiency of the evidence based on the charge as submitted in the absence of
objection or requested instruction.  See
Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).





[11]  We note that
the parties dispute the ultimate cause of the blowout.  Rebel contends that at the time of the
blowout, the pressure in the well was still within the capacities of the BOPs;
however, a Abonnet seal@ defect
caused the BOPs to fail below their capacities. 
In contrast, Nabors contends the blowout occurred  because the pressure in the well exceeded the
capacities of the BOPs.  However, on appeal,
Nabors stresses that even under Rebel=s
theory, the evidence was factually sufficient to support the jury=s verdict.  In
particular, Nabors asserts that even under Rebel=s
theory, the blowout could have been prevented if Rand had properly tested the
BOPs before the blowout or immediately shut in the well when the kick was
detected.  Because we find the evidence
factually sufficient to support the verdict under Rebel=s theory, we will not analyze the evidence regarding
the pressure at the time of the blowout.





[12]  Rebel also
contends the kick was foreseeable to Nabors. 
Nabors apparently does not dispute that the kick was foreseeable
although it assigned some responsibility to Rand to foresee the kick.  Regardless, the evidence demonstrates that
Nabors did properly detect the kick.  It
is the actions taken in response to the kick that are at issue.





[13]  Industry
standards and Nabors=s own policies dictate that a well be immediately shut
in when a kick occurs.  Nabors=s employees are taught at well control school and
trained on the job to shut in a well when a kick is detected.  Neal Adams, Nabors=s expert, agreed that Aif it=s flowing . . . you close in the well, period. No
exceptions.@ 





[14]  In contrast,
under a Aturnkey@
contract, the driller drills the well for a fixed price, assumes all risks and
responsibilities, including responsibility for well control, and hands the
operator a complete well when drilling is complete.





[15]  Campbell
explained that the operator has the knowledge of what is being drilled and
anticipated pressures and formations.





[16]  Rebel suggests
Nabors=s contractual argument amounts to an argument that it
had no duty to Rebel, but Rebel was not a party to the daywork contract.  To the contrary, according to Nabors, it did
not proximately cause the blowout because it could not take over well control
due to potential consequences under the daywork contract.





[17]  Shirley knew
they were Ain trouble@ when
Little did not want to shut in the well. 
Further, although he was not present at the time of the blowout, Mike
Wilson, Nabors=s toolpusher in the days before the blowout, described
Little as a Ablooming idiot,@
incompetent, not concerned about safety, and unprofessional.  In addition, Nabors=s management thought Rand was imprudent and did not
follow good drilling practices.  





[18]  For example,
Campbell testified that two weeks before the blowout, he met with a Rand
manager to encourage enforcement of safety policies on the rig although he
could not recall specifically discussing well control issues.  In response, the manager=s attitude was that he intended to teach this
Mississippi Nabors=s crew how to drill a well. 





[19]  The manual
also contains some Aunbreakable@ driller=s rules including, ADO NOT
TAKE SHORTCUTS OF COMPANY PROCEDURE that could endanger you or your crews.@ 





[20]  Moreover, Beck
explained that the new policy does not alleviate the operator=s primary responsibility for well control under a
daywork contract.  Rather, Nabors=s contracts now include a provision whereby the
operator agrees to use Nabors=s drilling policy as a minimum standard, and Nabors=s toolpusher is now empowered to take control if the
company man is making a critical mistake.





[21]  Nabors
contracted Wild Well Control to review several blowouts, so Nabors could revise
its drilling policy to reduce the number of future blowouts.





[22]  Further,
although the Rig 745 blowout occurred before the blowout at issue, the report
on the Rig 745 blowout was not rendered until after the blowout at
issue. 





[23]  In fact,
Little not only precluded Shirley from shutting in the well, but also ordered
Shirley to turn the pumps back on.  Neal
Adams, Nabors=s expert and Larry Kuhlman, Rebel=s expert, agreed that this action contributed to the
blowout because it allowed additional influx of gas and pumped gas to the
surface faster than it would have migrated naturally.





[24]  Under Rebel=s theory, the BOPs failed below their pressure
capacities due to a bonnet seal defect. 
It is undisputed that a proper pressure test would have detected any
bonnet seal defect.





[25]  Campbell
further explained that Nabors does not have the capability to fully pressure
test BOPs when drilling pursuant to a daywork contract because the operator
provides the testing equipment.  Palmer
reiterated that at the time of the blowout, Nabors had no authority to call an
independent company to test BOPs.





[26]  According to
Wilson, Little was not open to changing his mind and had the attitude that he Awas going to show us red necks how to drill a hole.@ 





[27]  In contrast to
an Aadjustable@ choke,
a Afixed@ choke has non-adjustable orifices. 





[28]  Beck explained
that a functioning choke manifold is not critical at the blowout prevention
stage, but later at the Akill stage@ when
the crew tries to circulate the gas out of the well.





[29]  Nabors argues
Rand was properly submitted because Nabors filed a cross-claim against Little,
and the trial court substituted Rand for Little in the charge.  In response, Rebel asserts that the trial
court struck Nabors=s cross-claim. 
Nevertheless, we need not consider whether submission of Rand was
improper because any error was harmless.





[30]  Nabors
contends that Rebel failed to preserve error on this complaint.  During the charge conference, Rebel objected
that the charge did not include the requested instructions and informed the
trial court it had submitted trial briefs supporting the instructions.  However, the trial briefs are not included in
our record; therefore, we do not know whether Rebel apprised the trial court of
the specific basis for its requested instructions.  See
Tex. R. App. P. 33.1(a)(1)(A). 
Nevertheless, we will consider Rebel=s
complaint because we ultimately conclude that the trial court did not err by
refusing to submit the requested instructions.





[31]  Cameron was
the manufacturer of the single and double 10,000 psi BOPs at issue.





[32]  Based on our
disposition of Rebel=s issues, we need not consider Nabors=s cross-issue contending the trial court erred in denying
Nabors=s motion for directed verdict.